_____

**CONCURRENCE**
_____

CLAY, Circuit Judge, concurring. Because my view of the issue that I would otherwise find meritorious—the jury instruction issue, has been rejected by our circuit, I concur in the majority opinion in its entirety. However, I write separately to reiterate my belief that a jury instruction which leaves the jury with the impression that it could not consider imposing a life sentence without first unanimously rejecting a death sentence is unconstitutional. *See Henderson v. Collins*, 262 F.3d 615, 623-29, 636-37 (6th Cir. 2001) (Clay, J., dissenting). Although my view of this issue was rejected by the majority in *Henderson*, and therefore cannot serve as a basis upon which to grant Petitioner relief in the instant case, I continue to be of the mind that such jury instructions violate the Constitution for all of the reasons set forth by my dissent in *Henderson*. *See id.* With respect to Petitioner's other assignments of error, I agree with the majority opinion that those issues lack merit.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0381P (6th Cir.)
File Name: 02a0381p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

JOHN GLENN ROE,
    *Petitioner-Appellant,*

    *v.*

DENNIS BAKER,
    *Respondent-Appellee.*

No. 00-4260

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 96-00825—Edmund A. Sargus, Jr., District Judge.

Argued: January 31, 2002

Decided and Filed: October 31, 2002

Before: SUHRHEINRICH, SILER, and CLAY, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** David L. Doughten, Cleveland, Ohio, for Appellant. Stephen E. Maher, ATTORNEY GENERAL'S OFFICE OF OHIO, CAPITAL CRIMES SECTION, Columbus, Ohio, for Appellee. **ON BRIEF:** David L. Doughten, Cleveland, Ohio, for Appellant. Stephen E. Maher, ATTORNEY GENERAL'S OFFICE OF OHIO,

CAPITAL CRIMES SECTION, Columbus, Ohio, for Appellee.

SILER, J., delivered the opinion of the court, in which SUHRHEINRICH, J., joined. CLAY, J. (p. 24), delivered a separate concurring opinion.

———————

**OPINION**

———————

SILER, Circuit Judge. Petitioner John Glenn Roe appeals the denial of his plea for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court granted a certificate of appealability for twenty-two of the thirty-four issues raised below. Roe raises seven of those certified issues in this appeal, alleging that (1) the jury instructions addressing unanimity in its sentencing recommendation violated his constitutional rights; (2) remarks by the prosecutor during the sentencing phase of the trial rendered his trial fundamentally unfair; (3) the admission of testimony that he possessed a list of all the potential jurors names and addresses violated his constitutional right to an impartial jury; (4) the trial court has a constitutional obligation to sentence a defendant on underlying felonies prior to commencement of the capital sentencing phase of the trial; (5) an indictment reciting alternative theories of kidnapping does not meet constitutional notice requirements; (6) the Ohio capital sentencing scheme does not adequately narrow the class of offenders eligible for the death penalty; and (7) on post-conviction review, the state appellate court failed to provide a full and fair review of his claims of ineffective assistance during the sentencing phase of his trial. We affirm.

**I.**

The Supreme Court of Ohio set forth the facts underlying Roe's criminal convictions in its decision affirming those convictions and the sentence of death, which the district court relied upon, as follows:

F.2d 245, 247 (6th Cir. 1986), we held that relief may not be granted to a habeas petitioner for alleged deficiencies in a state's post-conviction procedures because such claims relate to a state civil matter, not the custody of a defendant. Therefore, even if Roe can demonstrate that some error occurred during the state post-conviction proceedings, the claim is not cognizable on federal habeas review.

**IV.**

For the foregoing reasons, the district court did not err in dismissing the habeas petition pursuant to § 2254.

**AFFIRMED.**

felony murders subject to the death penalty by excluding those who commit [murder in the course of an] arson, robbery, burglary or escape, unless they are charged with a different aggravating circumstance." *Scott*, 209 F. 3d at 885, *cert. denied*, 531 U.S. 1021 (2000) (citation and quotations omitted).

7.    **Whether on post-conviction review the state appellate court provided a full and fair review of Roe's claims of ineffective assistance during the penalty phase of his trial?**

Roe argues that irregularities in the state appellate courts deprived him of a full and fair hearing in the appellate review of his post-conviction claims filed pursuant to O.R.C. § 2953.21. Specifically, the trial court denied his claim of ineffective assistance of counsel based upon counsel's failure to call a psychologist to the stand during the penalty phase.[2] Roe appealed the denial to the Ohio Court of Appeals. The court of appeals, however, refused to consider the transcript of the testimony at the post-conviction hearing on this issue because – Roe claims "due to a clerical error" – that transcript was never made part of the record. The court of appeals also denied Roe's motion to reconsider its decision not to review the hearing transcript. Roe alleges that this failure to consider the transcript constituted a violation of due process and equal protection.

There is no substantive merit to this claim. The court of appeals did address the issue Roe raised on appeal; it just would not review the late-filed transcript of the hearing below in its consideration of the issue. Nevertheless, this court need not reach the merits of this issue. In *Kirby v. Dutton*, 794

---

[2]We note that Roe claims ineffective assistance because defense counsel strategically elected not to offer the testimony of the defense psychologist, Dr. Albert Virgil, during the capital sentencing phase of the trial, not that he did not consult with and prepare that testimony. Further, counsel did offer the testimony of twenty-one other witnesses in support of mitigation.

The appellant, John G. Roe, was convicted by a jury of the kidnapping, aggravated robbery and aggravated murder of Donette R. Crawford, and was sentenced upon the recommendation of the jury to death for aggravated murder. On the evening of October 5, 1984, Donette Crawford left her infant daughter with her parents on the west side of Columbus and went with a friend, Toni Jester, to the Alrosa Villa Tavern in the north end of Columbus. Crawford had cashed her paycheck that day and locked most of her money in her car before entering the tavern. The pair left the tavern around 2:15 a.m. on October 6. Jester drove the car to her home while Crawford sat on the passenger's side looking for her cigarettes. Upon leaving Jester at her home on the west side of Columbus, Crawford stated she was going to pick up her daughter and go home, which was less than a mile away. On her way, and between 2:40 and 3:00 a.m., Crawford stopped at a nearby 7-Eleven convenience store on West Mound Street to buy a pack of cigarettes. An acquaintance of Crawford last saw her as Crawford left the 7-Eleven and continued west on Mound Street.

At approximately 5:30 a.m., Crawford's mother, who was concerned that Donette had not returned to pick up her daughter, telephoned Jester and Donette's common-law husband, Steve Steiner, to find out where Donette might be. When she learned that neither party had seen nor heard from Crawford, Crawford's mother began looking for her. Later that Saturday morning, when Crawford's father went looking for Donette, he found his daughter's empty car parked in the parking lot of St. Agnes Church on West Mound Street. The car had been ransacked, and the keys were later found in a flower bed at the church. Donette's wallet, purse, and money were never found.

On or about October 6, 1984, the Huntington Clothiers store on Alum Creek Drive on the near east side of Columbus was broken into through a hole in the wall, and a considerable amount of clothing was taken. A

security guard was hired to watch the building on Sunday night, October 7, 1984. At 8:05 p.m., the guard observed a car pull into a lot near the store. The driver in the car waited about five minutes and then got out and proceeded to walk to the Huntington Clothiers store. He then entered the store through the hole in the wall. The police were called and the guard attempted to block the hole with his vehicle, but the subject, a slim white male with long hair, slipped out and ran. The guard gave chase and fired three shots at the subject, who nevertheless escaped. The subject's car was impounded and later identified as being registered to the appellant. At approximately 11:30 p.m., appellant's mother, Joyce Lucas, took appellant to the home of Michael and Patricia Daniel and asked if he could stay with them overnight. Appellant had been shot in the foot, which, he explained, occurred while running from a store he had broken into that night. Appellant then characterized the event as minor when compared to his shooting of a woman in the head the previous Friday night. The Daniels that night dismissed his description of the murder as in keeping with his character as a braggart.

A month later, on November 6, 1984, appellant was arrested with Moses M. Stevens while breaking into a Radio Shack store in Beavercreek, Ohio. Once in custody, appellant was read his rights, which he waived, agreeing to speak with the police. After discussing his breaking and entering charges, appellant offered that he had information regarding a missing woman in Columbus – information that she had been killed and that he knew who was involved and where the body could be found. Appellant indicated he wished to exchange this information to deal with his current charges. Beavercreek Detective Harry W. Anthony then asked appellant if he would like to talk about it later, and appellant agreed. The next day, appellant claimed that a person named Jerry Powell had shot the woman in the face and dumped her body behind a cement plant on Alum Creek Drive in Columbus. Appellant described

against him, violating his due process rights and fundamental fairness.[1]

Unquestionably, from the indictment Roe had notice of the kidnaping charge against him and both alternative theories of the kidnaping. This court need not go further. Beyond notice, a claimed deficiency in a state criminal indictment is not cognizable on federal collateral review. *Mira v. Marshall*, 806 F.2d 636, 639 (6th Cir. 1986) ("The indictment here had sufficient information to provide petitioner with adequate notice and the opportunity to defend and protect himself against future prosecution for the same offense. Any other deficiencies in the indictment alleged by petitioner are solely matters of state law and so not cognizable in a federal habeas proceeding.").

**6.  Whether the Ohio capital sentencing scheme adequately narrows the class of offenders eligible for the death penalty?**

Roe challenges the constitutionality of the Ohio capital sentencing scheme. He claims that his death sentence violates his rights under the Eighth and Fourteenth Amendments to the United States Constitution because it fails to properly narrow the class of persons eligible to receive the death penalty. Specifically, he contends that, in effect, every person who is convicted of felony murder is automatically eligible to receive a death sentence, and the aggravating circumstance merely repeats what the jury would have necessarily found in order to convict him of the underlying felony.

*Scott* addressed this precise challenge, which it rejected, holding that "the Ohio Legislature narrow[ed] the class of

---

[1] Roe also cites *Apprendi v. New Jersey*, 530 U.S. 466 (2000), in support of this argument, and argues that submission of both theories to the jury constitutes an improper amendment to the indictment by the trial judge. *Apprendi* addressed sentencing factors that may increase a sentence in excess of the statutory maximum and is not relevant to this issue.

the maximum amount the jury could recommend. Therefore, the whole analysis of the line of cases cited by Roe undermines Roe's arguments. In those cases, a defendant sought an instruction that he would be ineligible for parole so that the jury would know that he would pose no future danger to society, and jurors, thus, might be less inclined to sentence a defendant to death. Here, Roe argues that the jury might have been swayed if the court had sentenced him prior to the capital phase because the jury would know that he would be eligible for parole, just ten years later than they could have sentenced him. Not only is this speculation, but the logic of that assertion is questionable and certainly not of constitutional magnitude.

**5.    Whether an indictment which recites alternative theories of kidnapping meets constitutional notice requirements?**

The capital specification of Roe, pursuant to O.R.C. § 2929.04(A)(7), charged that he was the principal offender or committed the aggravated murder with prior calculation and design during the commission of a kidnaping. However, O.R.C. § 2905.01 defines kidnapping in alternative theories. Roe objects to the government's failure to specify in its indictment which specific theory of kidnaping it intended to prove. The alternative theories charged in the indictment both as to the kidnaping charge and capital specification alleged that Roe "(1) did by force, theft or deception remove the victim from the place where she was found with a purpose to facilitate the commission of a felony, or (2) did by force, theft or deception knowingly or under circumstances which created substantial risk of serious physical harm to victim remove the victim from the place where she was found." The trial court submitted both theories to the jury. Roe argues that the failure of the trial court to force the government to elect a specific theory denied him proper notice of the charges

Crawford's car, stated she was possibly shot with a .357 magnum handgun, and gave details including a map of the location of the body. He then indicated his willingness to talk to Columbus police about Crawford. Detective Anthony verified the information about the missing woman with Columbus police and then arranged for them to talk with appellant.

On November 12, 1984, Columbus Police Detectives Stephen Judy and David Verne went to the cement plant to familiarize themselves with the area and then drove to the Greene County Jail to talk with appellant. Appellant repeated his earlier description of the body's location, and of Jerry Powell's involvement, and tentatively identified photographs of Crawford and her car. On November 15, 1984, the area described by appellant was searched, and the decomposed remains of Crawford were discovered. The remains were identified by the clothing found with them and by use of Crawford's dental records. A hole, consistent with a gunshot wound, was located in the lower back right portion of the skull. However, subsequent investigation of Jerry Powell, including a polygraph examination, excluded him as a suspect.

On November 20, 1984, Detective Judy met with an anonymous caller, who was later identified as Michael Daniel, who conveyed his information concerning appellant's statement about a murder he had committed in October. Further investigation turned up appellant's weapon, a Ruger Security Six .357 magnum revolver. This weapon was traced back to a burglary of Castner's gun shop in Kirkersville, Ohio, on September 8, 1982. Appellant had committed two break-ins of Castner's in March 1981, had served jail time thereon, and was suspected of having committed the September 8 break-in as well. Other weapons stolen from Castner's were later recovered from the appellant's parents' home. Ballistics evidence indicated that a .38 caliber bullet fragment

recovered from Crawford's skull had been fired from appellant's revolver.

Appellant was indicted on December 26, 1984, for two counts of aggravated murder with two specifications for felony murder (kidnapping and aggravated robbery), R.C. 2903.01(B), 2929.04(A)(7), one count of aggravated robbery with a firearm specification, R.C. 2911.01, 2941.141, and two counts of kidnapping with firearm specifications, R.C. 2905.01, 2941.141. Trial began on November 4, 1985, and on December 6, 1985, the jury found appellant guilty on all counts and specifications. A sentencing hearing was held pursuant to R.C. 2929.03, and after three and one-half days of testimony and deliberations, the jury recommended the imposition of the death penalty. Following its independent review, the trial court accepted the jury's recommendation and, merging counts one and two, sentenced appellant to death for aggravated murder. In addition, merging the two kidnapping counts, the trial court sentenced appellant for the kidnapping and aggravated robbery, and two firearm specifications. The court of appeals affirmed the judgment of conviction and death sentence.

*State v. Roe*, 535 N.E.2d 1351, 1354-56 (Ohio 1989).

Following the Ohio Supreme Court's decision, and the United States Supreme Court's denial of certiorari, Roe filed a motion for post-conviction relief in the trial court, pursuant to O.R.C. § 2953.21, on October 3, 1990. The trial court held a hearing, and subsequently denied Roe's petition for post-conviction relief. Roe appealed, but in 1992, the Franklin County Court of Appeals affirmed the trial court's judgment dismissing his post-conviction claim. The Ohio Supreme Court denied Roe's request for a discretionary appeal in 1993.

Roe filed his habeas corpus action in 1995, raising thirty-four claims for relief. In 1996, the case was transferred to the Southern District of Ohio, the district of his conviction. Then, inexplicably, the case languished and was reassigned to several different judges. Finally, the case was assigned to

have been told of the defendant's parole ineligibility. There are three important differences between that case and this one, however. First of all, the defendant in *Simmons*, if convicted, was definitely going to be ineligible for parole. *Simmons*, 512 U.S. at 156, 114 S.Ct. 2187. Second, the prosecution's appeal to the jury for a death sentence was explicitly based on the defendant's future dangerousness, with the implication being that only death would protect the public for sure. *Id.* at 162, 114 S.Ct. 2187. Finally, the defendant in that case specifically requested the instruction at trial. *Ibid.* *Simmons* therefore does not apply to this case.

*Id.* at 346-47. Roe's argument is merely a variation of the argument in *Coe*. Thus, under *Teague*, this new rule would not be available to Roe.

Roe seeks to avoid the application of *Teague* by arguing that he relies on *Hitchcock v. Dugger*, 481 U.S. 393 (1987), rather than *Simmons* and its progeny – despite the fact that he bases most of his argument on these holdings and barely mentions *Hitchcock*. *Hitchcock*, however, is inapplicable; it held that a jury must be permitted to consider all relevant mitigating evidence. *Id.* at 398-99. In this case, however, Roe would have this court find that the Constitution mandates that a trial court sentence a defendant on all other charges prior to the capital phase so that the jury could know the exact amount of years before a defendant would be eligible for parole. There is no support for this argument in *Hitchcock*. Moreover, the jury knew that Roe would not be eligible for parole for at least the amount of time which they specified, either twenty or thirty years. Whether the actual time until parole eligibility is thirty-two or forty-two years cannot be said to be constitutionally significant to a jury's determination as no possibility of parole might, such as in *Simmons*.

Even if not barred, this arguments lacks any merit because, significantly, unlike *Simmons* and its progeny, Roe concedes that he would have been eligible for parole though perhaps in a worst case scenario after forty years rather than thirty years,

We addressed this issue in *Coe*, 161 F.3d 320, as follows:

As for parole eligibility, Coe argues that the jury should have been informed that, if he was given a life sentence for the murder, he would not be eligible for parole until he was 113 years old. That is, since his life sentences for rape and kidnapping meant that, under Tennessee law, he would have served 30 years on each sentence before he could be paroled, a life sentence for the murder would have been, effectively, a sentence of life without parole. Knowing this, Coe argues, the jury might have seen a life sentence as a more serious punishment, and therefore sufficient in lieu of a death sentence.

The sole grounding of the district court's rejection of this claim was that the claim was based on a "new rule" under *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L .Ed.2d 334 (1989). We agree that *Teague* would foreclose this claim if the procedural bar did not, since Coe relies on a case, *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L. Ed.2d 133 (1994), that was decided well after Coe's conviction became final in 1984, and was not sufficiently dictated by prior precedent. *See O'Dell v. Netherland*, 521 U.S. 151, 117 S.Ct. 1969, 1977-79, 138 L. Ed.2d 351 (1997) (holding that Simmons announced a new rule and retrospective application of the rule was barred by Teague).

Coe's claim fails anyway. There is no reason to assume or conclude that the sentencing judge in Coe's alternative scenario would have ordered Coe to serve his three life sentences consecutively instead of concurrently. *See* Tenn. R. Crim. P. 32(c)(1) (according such discretion to the trial court). Put another way, a juror would not necessarily have been wrong to believe that a death sentence was the only way to make sure that Coe never left prison alive.

Coe cites *Simmons*, in which three justices (and three more, concurring in the result) held that a jury should

Judge Sargus who dismissed the petition in 2000, but certified twenty-two issue for appeal to this court. Roe raises seven of those certified issues in this appeal. The government makes no claims of procedural default as to any of these seven issues.

## II.

Although we review *de novo* the district court's disposition of a petition for writ of habeas corpus, we review the district court's factual findings only for clear error. *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996). Further, federal courts must defer to state court factual findings, according to them a presumption of correctness that the petitioner may rebut only with clear and convincing evidence. *Id.* However, "[t]he presumption only applies to basic, primary facts, and not to mixed questions of law and fact," which receive *de novo* review. *Id.*

In setting forth this standard of review, the effect of the amendments to 28 U.S.C. § 2254 contained in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132, 110 Stat. 1214 (1996), has been ignored. Although AEDPA became effective on April 24, 1996, and it mandates significant changes to the federal courts' treatment of both factual and legal issues in the habeas setting, the Supreme Court's decision in *Lindh v. Murphy*, 521 U.S. 320 (1997), instructs that those changes do not apply to this case, or to any case pending at the time of the AEDPA's enactment; instead, those changes "generally apply only to cases filed after the Act became effective." *Id.* at 336. Because Roe filed his habeas petition in 1995, we must apply § 2254(d) as it existed prior to enactment of AEDPA. *Id.*

## III.

Roe does not contest on appeal any of the facts underlying his convictions. All seven of his assignments of error allege various procedural errors by the state courts. We address each assignment in turn.

**1.    Whether the jury instructions addressing unanimity in its sentencing recommendation violated Roe's constitutional rights?**

Roe objects to the trial court's instructions to the jury related to its sentencing recommendation. The first instruction at issue was given, as follows:

As in the first case, and this is not in the written instructions, as in the first case your verdict must be a unanimous verdict. All 12 of the jurors must agree unanimously on the appropriate verdict. Once you have made such a finding, again you would notify my bailiff with respect to that. All 12 jurors have to sign the verdict form. The foreperson will sign on the line designated foreperson.

The second instruction at issue was given earlier, as follows:

Now each of you must decide the case for yourself, but you should do so only after a discussion and consideration of this case with your fellow jurors. Now do not hesitate to change an opinion if you later find that that opinion or that position is wrong. However, you should not surrender honest convictions in order to be congenial or in order to reach a verdict solely based upon the opinion of the other jurors.

The relevant Ohio statute provides:

If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender. Absent such a finding, the jury shall recommend that the offender be sentenced to life imprisonment with parole eligibility after serving twenty full years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment.

deny the defendant the fundamental right to a fair trial. *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994) (citing *Logan v. Marshall*, 680 F.2d 1121, 1123 (6th Cir. 1982)). Roe has not met this burden by demonstrating that the admission of this evidence rendered his trial fundamentally unfair. If the court adopted his reasoning, a juror made aware of the statute regarding this matter during trial would create prejudice rendering a trial fundamentally unfair. Rather than instruct the jurors as to the law, the court would have to conceal this statute and the public records law from the jurors. Likewise, during selection, awareness of either of these laws might constitute grounds for striking a juror.

**4.    Whether the trial court has a constitutional obligation to sentence Roe on underlying felonies prior to commencement of the capital sentencing phase of his trial?**

The trial court denied Roe's several requests that he be sentenced on the non-capital felonies prior to the sentencing phase on the aggravated murder convictions, which forms the basis for this assignment of error. The options before the jury during the capital sentencing phase were death, life with parole eligibility after 20 years, or life with parole eligibility after 30 years. Roe argues that had the jury known the sentences as to these other charges that it would have been more likely to select parole, and it is error to preclude the jury from the consideration of evidence which may mitigate a sentence under *Skipper v. South Carolina*, 476 U.S. 1 (1986). As support for this contention, he stresses that during the deliberations following the penalty phase hearing, the jury submitted a question, asking, "[w]ill the sentences run consecutively or concurrently?" With agreement of both parties, the trial court responded that "[t]he sentences on the murder charges will merge and there will be only one sentence on those charges. The sentence on the firearms specification, by law, must be run consecutive to the other sentences. The sentences on the aggravated robbery and the kidnapping will be determined by the Court after your verdict is rendered."

verdict may be, may be public. So I think it's something you are all aware, directly you are here in public proceedings and all trials will be a matter of public record.

This issue never arose again throughout the remainder of the trial. Roe, however, contends that the admission of the juror list information severely prejudiced and tainted the trial proceedings to the extent that he was denied a fundamentally fair trial. He argues that the jurors' taking the extraordinary step of advising the bailiff of their fear and concern over the issue evinces prejudice. Further, advising the jury that the list was required to be provided to Roe and is an available public record did little to remove the prejudicial effect. Thus, he avers his Sixth Amendment Right to a fair and impartial jury was violated.

On this issue, the Supreme Court of Ohio held:

This argument is without merit. The trial court explained to the jurors that the appellant was entitled to such list by statute and that it was, in any event, public information. The testimony was relevant to demonstrate that the cellmate did not fabricate his testimony from reading appellant's "legal papers" as the only such papers he saw were the jury lists. Evid. R. 401. Appellant has not demonstrated that the probative value of such evidence was substantially outweighed by the danger of unfair prejudice. Evid. R. 403(A).

*Roe*, 535 N.E.2d at 1359. As the Ohio Supreme Court held, in light of Roe's strategy of undermining Boyd's credibility by insinuating that he gained his information from reading Roe's papers, it was critically relevant what information those papers contained. Juror lists are provided to Roe as a matter of state law. The court addressed the concern expressed by some jurors with a thorough curative instruction. The record reflects no further manifestation of concern by the jurors after the instruction. Errors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to

O.R.C. § 2929.03(D)(2) (1985). Roe's argument, then, is that though the court correctly instructed the jurors that their sentencing recommendation of death had to be unanimous, it erroneously failed to instruct the jurors that unanimity was not required to sentence Roe to either life imprisonment with parole eligibility after serving twenty years or life imprisonment with parole eligibility after serving thirty years. The district court described the issue in this manner:

It is clear from this statutory provision that a jury's recommendation of death must be unanimous. Equally clear is the fact that this provision does not require a capital jury to unanimously reject a death sentence in order to impose one of the life sentence options. What seems ambiguous is whether one of the life sentence recommendations could result – not just from a unanimous determination by the jurors that it was the appropriate sentence – but from an inability of the part of the jurors to achieve unanimity on whether to recommend a death sentence.

In essence, Roe contends that the failure of the court to instruct the jury regarding the result of any deadlock as to the imposition of a death sentence may have resulted in the impression on the jury that it must unanimously reject death, rather than a single juror's being capable of preventing a death sentence by creating a deadlock.

The Ohio Supreme Court has issued several decisions on this point. In *State v. Jenkins*, 473 N.E.2d 264, 306-7 (Ohio 1984), it held that a jury's recommendation of life imprisonment under that section must be unanimous. In *State v. Springer*, 586 N.E.2d 96, 100 (Ohio 1992), the court held that when a jury becomes hopelessly deadlocked as to sentence, the trial court is required to impose a life sentence. In *State v. Brooks*, 661 N.E.2d 1030, 1040-42 (Ohio 1996), the court reviewed a sentencing instruction that the jury must unanimously agree that the death penalty is inappropriate before recommending a life sentence. The court found this instruction contrary to § 2929.03(D)(2). *Brooks* purported to

"harmonize" the *Jenkins* and *Springer* holdings by requiring an instruction to be given thenceforth that a solitary juror could prevent the imposition of the death penalty.

Nevertheless, "the fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). The issue on collateral review in the federal courts is whether a defendant's federal constitutional rights were violated by the instruction. We addressed this same issue in *Coe v. Bell*, 161 F.3d 320, 339-40 (6th Cir. 1998), and held that such a unanimity instruction as to a sentencing recommendation of death did not violate the Constitution. Again in *Scott v. Mitchell*, 209 F.3d 854, 876 (6th Cir. 2000), we observed the same. Just as in *Coe* and *Scott*, the instructions at issue do not require unanimity as to a specific mitigating factor, which would violate *Mills v. Maryland*, 486 U.S. 367, 376 (1988), but only as to the overall weighing process, which is permissible. Further, as we observed in *Scott*, both this Circuit and the Supreme Court "[have] chastised such instructions as encouraging deadlock and undermining the strong governmental interest in unanimous verdicts." *Scott*, 209 F.3d at 877 (citing *Jones v. United States*, 527 U.S. 373, 381-84 (1999) and *Coe*, 161 F.3d at 339-40). Accordingly, this assignment is without merit.

Roe relies on *Mapes v. Coyle*, 171 F.3d 408 (6th Cir. 1999), to support his argument. He contends that *Mapes* held such a unanimity instruction violates Ohio law:

The Ohio death-sentence statute contains no requirement that a capital jury must unanimously reject a death sentence before considering life imprisonment. . . . Moreover, the Ohio Supreme Court has ruled that an acquittal-first instruction, such as the one given by the trial court here, violates the Eighth and Fourteenth Amendments by creating a risk of an erroneous imposition of the death penalty. *See State v. Brooks*, 75 Ohio St.3d 148, 661 N.E.2d 1030, 1041 (1996). The record reflects that the jury in this case was instructed in

*United States v. Bess*, 593 F.2d 749, 757 (6th Cir. 1979) (citations omitted). This case easily falls into that category.

3.  **Whether Roe's constitutional right to an impartial jury was violated by the admission of testimony that he possessed a list of all the potential jurors' names and addresses?**

Vincent Boyd, Roe's cellmate, testified against him at trial regarding certain incriminating admissions made by Roe to him. Admittedly, the defense attempted to discredit his testimony on cross-examination with questions designed to show that he knew details of the case by reading Roe's legal papers in the cell. On re-direct, the prosecution asked Boyd what he remembered about the papers. Boyd denied seeing them except cursorily and said that the only thing he remembered was a list of all the jurors' names and addresses. Roe objected, and the trial court overruled that objection, having already conducted a sidebar as to this general issue. Later, counsel moved for a mistrial on that basis, which the trial court denied. After the lunch recess, the jurors expressed their concern to the bailiff about Roe's possessing a list of their names and addresses. The bailiff advised the court. The court then gave the following curative instruction to the jury:

There has been brought to my attention some concern about testimony concerning the jury list. As you may or may not be aware, we have 300 individuals subpoenaed for this particular jury. We have got 75 for Monday, Tuesday, Wednesday, and Thursday. Our legislature, in their infinite wisdom, decided in all capital cases, which is the only time when it's provided in the state statute, that the entire computer printout with all 300 names is to be given to all parties, the prosecution and any defense and the defendant, three days before trial. So that list, by statute, all parties have a right to a copy of that list.

Also you should be aware that all trials are public proceedings, and obviously the public is invited down and everything that happens in the trial, including, you know, who the jurors are[,] are public as whatever the

crime was under duress, coercion, provocation. I remind you of what Mr. Roe said in his unsworn statement. I could have stayed home, no one forced me, I wanted the money. He wanted to do it. He did it." In considering this assignment of error, the Supreme Court of Ohio held:

> The prosecutor commented on statutory mitigating factors on which appellant had not presented evidence at the hearing. In *State v. DePew* (1988), 38 Ohio St.3d 275, 289, 528 N.E.2d 542, 557, we stated that "such comment is appropriate only with regard to those factors actually offered in mitigation by the defendant." Here, however, as in *Williams*, *supra*, 23 Ohio St.3d at 23, 23 OBR at 19, 490 N.E.2d at 913, appellant failed to timely object to such comment below, and in any event, the trial court's instructions to the jury regarding both non-statutory and statutory mitigating facts were sufficient to correct any error on the part of the prosecution. Although the prosecution's argument was improper, it did not amount to a conversion of mitigating factors into prohibited non-statutory aggravating factors.

As below, the government does not argue that such comments were appropriate, but they were limited, isolated and mitigated when the court gave the jury appropriate instructions, which would have cured any misperception that the jury might have received from the prosecutor's arguments. We agree. Moreover, such passing comments did not render the sentencing phase fundamentally unfair. When reviewing prosecutorial misconduct on direct appeal, this court has remarked:

> More commonly, however, the complained-of conduct will not rise to reversible error, notably if it is not flagrant, where proof of guilt is overwhelming, where counsel does not object and/or where the trial judge steps in and admonishes the jury. Indeed, it is notable how often courts cite improper argument by a prosecutor and how seldom they reverse convictions because of it.

a manner completely contrary to law, . . . . This error required vacating the death sentence and remanding for re-sentencing. . . . Although the trial court in this case did not have the benefit of *Brooks*, that case clearly establishes that the trial court misapplied Ohio Revised Code § 2929.03(D)(2) by requiring the jury to unanimously reject the death penalty before considering a life sentence.

*Id.* at 416-17. Nevertheless, *Mapes* ultimately held "[b]ut all that being so, the trial court's instructional errors do not require granting Mapes's habeas petition because neither of these last two instructional issues was raised on appeal. Thus, Mapes's procedural default is an adequate and independent ground for affirming his sentence." *Id.* at 416. Accordingly, the *Scott* court in addressing the same issue found the *Mapes* language to be *dicta*. Ironically, the *Scott* court likewise found the issue procedurally defaulted and addressed the merits in the alternative only "out of an abundance of caution and in order to clarify our precedents governing sentencing-phase instructions on jury unanimity." *Scott*, 209 F.3d at 873. Yet, as the *Scott* court emphasized, in 1998 – a year prior to *Mapes* – this court had directly and conclusively addressed the same issue in *Coe*. *See id.* at 877. Therefore, even if *Mapes'* discussion was not *dicta*, *Coe* would control.

**2.    Whether remarks by the prosecutor during the sentencing phase of the trial rendered Roe's trial fundamentally unfair?**

Roe maintains that the prosecutor's arguments at the mitigation hearing deprived him of a fair sentencing hearing because those comments improperly denigrated the entire notion of a mitigation hearing, and, were arguments as to evidence of mitigating factors not presented by Roe.

Though not procedurally defaulted, as Roe raised this issue in his state appeal, his counsel did not object to any comments of the prosecutor at trial. Thus, as both the Supreme Court of Ohio and the district court held, this issue was not preserved. Accordingly, we review for plain error. *United States v.*

*Crozier*, 259 F.3d 503, 516 (6th Cir. 2001). To establish plain error, a defendant must show that: (1) an error occurred in the district court; (2) the error was plain, *i.e.*, obvious or clear; (3) the error affected defendant's substantial rights; and (4) this adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *Id.* Roe does not show either that the remarks affected his substantial rights or such remarks seriously affected the fairness, integrity, or public reputation of the judicial proceedings, as he must. *Id.*

First, with regard to denigration of the mitigation process, the prosecutor merely argued that the victim's perspective was ignored in a mitigation hearing:

> [Defendant] usurps the compassion that is justly his victim's due. He will steal his victim's moral constituency along with her life. . . . And now [Defendant] asks you, ladies and gentlemen, without a word of remorse, with only tears for himself, without a tear for his victim. Not a word – I'm sorry. He wants you to give him what he would have gotten if [the victim] had been allowed to live – jail.

Roe asserts that this argument from the prosecutor "essentially asked the jury to agree that the entire concept of a mitigation hearing was repugnant and constituted an attempt to steal or usurp the victim's 'moral constituency along with her life.' This form of argument undermined the integrity of the entire process and [offended] the constitutional concept of a 'fair trial.'" It is not clear that these comments denigrated the mitigation process, but, rather, as the district court held, "[t]he prosecutor argued, in essence, that the victim's life had ended and that only [Roe]'s plight could be presented, in person, to the jury. To this extent, the prosecutor's comments concerning the victim, understandably dramatic and emotional in the case of a crime involving a violent killing, were well within the constitutional parameters of a fair trial."

In *Payne v. Tennessee*, 501 U.S. 808, 827 (1991), the Supreme Court held that the Eighth Amendment does not prohibit evidence and argument relating to the victim's personal characteristics and the impact of the victim's death on the victim's family. Under *Payne*, such argument would be proper. The Court, however, left open the question as to whether under the Fourteenth Amendment such arguments, when unfairly prejudicial, might offend due process. The standard for such due process challenges is whether the evidence or argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (concerning admission of evidence); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) (concerning prosecutorial misconduct). A court must look to the totality of the circumstances to determine whether the misconduct denied Roe a fair trial. *Summit v. Bordenkircher*, 608 F.2d 247, 253 (6th Cir. 1979). We have identified the factors to be considered in weighing the extent of prosecutorial misconduct in habeas cases. We consider (1) the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; (2) whether they are isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (3) the strength of the competent proof to establish the guilt of the accused. *Angel v. Overburg*, 682 F.2d 605, 608 (6th Cir. 1982) (citing *United States v. Leon*, 534 F.2d 667, 679 (6th Cir. 1976)). Even if the prosecutor's comments conveyed the meaning that Roe alleges they conveyed, it is clear that such isolated and indirect comments did not render Roe's trial fundamentally unfair.

Second, with regard to the prosecutor's comments as to the absence of evidence as to certain mitigation factors, Roe points to the following statement, "[i]n some crimes, the victim has something to do with what happened, the victim is somehow partially to blame. What makes this crime so repulsive, what absolutely tests your faith in the mercy of God is [the] awesome randomness of the crime," as well as, "[s]ome crimes you find that the person who commits the