**Mickey Lee DAVIS, Petitioner–Appellant,**

**v.**

**Sherry BURT, Respondent–Appellee.**

No. 02–2333.

United States Court of Appeals,
Sixth Circuit.

April 9, 2004.

Before: COLE and CLAY, Circuit Judges; and COLLIER, District Judge.*

**OPINION**

COLLIER, District Judge.

Petitioner–Appellant Mickey Lee Davis ("Davis") appeals *pro se* from the district court's order denying his application for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Davis challenges his 1996 convictions for first-degree murder and possession of a firearm during the commission of a felony. He raised nineteen grounds for relief, and the district court granted a certificate of appealability as to all nineteen asserted grounds. For the reasons set forth below, we **AFFIRM** the district court's denial of Davis' application.

## I. FACTUAL BACKGROUND

Davis was convicted of first-degree murder and possession of a firearm in the commission of a felony in state court in Michigan. The victim was his estranged wife, Priscilla Davis, from whom he was divorcing and with whom he was contentiously contesting the custody of their four-year-old daughter, Alyssa. Witnesses placed Davis in his wife's neighborhood in Benton Township, Michigan, in the late afternoon of October 6, 1995, the date of the murder. Melissa Peters, Davis' girlfriend, testified Davis left her there to case his wife's residence. Meanwhile, Davis drove to Kalamazoo, part-way between Benton Township and his residence in Lansing. Around 6:00 p.m. Davis met his wife at a convenience store there to pick up their daughter.

According to testimony at trial, Davis and his daughter left the Kalamazoo convenience store around 6:25 p.m. and returned to his wife's neighborhood in Benton Township. Davis met Peters and they broke into his wife's residence. Peters believed their purpose was to take jewelry Davis said was for his daughter. Sometime after 7:00 p.m., Priscilla Davis returned to her residence, and Davis shot her multiple times in the head. Peters went into the bedroom where the shooting

* The Honorable Curtis L. Collier, United States District Judge for the Eastern District of Tennessee, sitting by designation.

occurred, and Davis told her she must also shoot his wife because Peters had seen what he was doing. Davis then placed the barrel of the pistol against his wife's temple and fired another round into her head. Next he hit Peters, threatened her, and made her shoot the victim. Peters shot her in the leg.

About 10:00 p.m. on October 6, 1995, Priscilla Davis was found dead in her residence. A medical examiner testified at trial she died from gunshot wounds to her head and testified a gunshot wound to the victim's leg was inflicted after the victim died, consistent with Peters' description of the shot she fired. According to the medical examiner, the victim died sometime between 7:00 p.m. and 10:00 p.m., based on when people saw her and when her body was found. Though not produced at trial, the death certificate estimates the time of death as 7:15 p.m.

According to Peters, she and Davis left Benton Township and drove to Lansing. Davis stopped by a bridge on the way home to relieve himself, and he threw the murder weapon and the victim's cell phone into the nearby river. Divers recovered those items where Peters said they should look, and the firearm recovered from the river was found to have fired the shots that killed the victim. Peters further testified Davis used a makeshift silencer–the combination of a plastic soft drink bottle, cloth, duct tape, and metal fibers–when he shot his wife. Fragments of those materials were recovered from the victim's body and from her residence.

Davis maintained he was not involved in his wife's fatal shooting. He offered an alibi that he and his daughter went to a fast food restaurant between Kalamazoo and Benton Township when they left the convenience store. Later he picked up Peters at another location and returned to Lansing. To find witnesses to corroborate his alibi he and his daughter were at a restaurant, Davis wanted to run an advertisement in the newspaper featuring their photographs, in hopes someone would recognize them from the restaurant and testify he was there during the time of the killing. A friend of Davis took such photos to a McDonald's restaurant in the Kalamazoo area in an attempt to discover potential alibi witnesses, but Davis never ran a newspaper advertisement. His first appointed counsel, Michael Renfro, advised it would not be an effective strategy in part because at that time, before Peters agreed to testify against Davis, there was little proof against him. Further, the time Davis claimed to be at the restaurant with his daughter did not account for the full period during which his wife's murder could have occurred (between 7:00 p.m. and 10:00 p.m.).

When Davis filed an ethics complaint against Renfro, Ernest White was appointed to represent Davis. Like Renfro, White was in a law practice called Felony Defense Counsel, a corporation that routinely accepts appointed criminal cases. Near the time of trial, Davis wanted to call Renfro to testify that Davis asked him to run a newspaper advertisement to find alibi witnesses. White sought a ruling as to the admissibility of Renfro's proposed testimony because he would need to withdraw from representing Davis in the event Renfro would be a witness. The trial court held withdrawal was not necessary because Renfro's proposed testimony would be collateral to the issues to be decided by the jury and inadmissible because it was not relevant to Davis' alibi.

After the jury trial, Davis was convicted of first-degree murder and possession of a firearm in the commission of a felony. The Michigan Court of Appeals affirmed the convictions and the Michigan Supreme Court denied leave to appeal. Davis

sought postconviction relief from the judgment, which the Michigan trial court denied. He then moved for a waiver of fees when he sought to appeal the denial of postconviction relief, but the Michigan Court of Appeals ordered him to pay the fees within a given time because it appeared he had the ability to do so. When Davis did not pay the fees, the Michigan Court of Appeals dismissed his appeal. He did not appeal that dismissal to the Michigan Supreme Court. Davis then sought a writ of habeas corpus in United States district court. The district court denied his petition and certified all the issues for appealability, and Davis filed this appeal.

## II. STANDARD OF REVIEW

This Court reviews a district court's legal conclusions in habeas corpus proceedings *de novo*. *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir.1999). We review the district court's findings of fact for clear error. *Id.*; *Carson v. Burke*, 178 F.3d 434, 436 (6th Cir.1999).

Federal courts evaluate habeas petitions according to the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (1996) (codified as amended at 28 U.S.C. § 2254) ("AEDPA"). *Harpster v. Ohio*, 128 F.3d 322, 326 (6th Cir.1997). The AEDPA's objective is "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693, 122 S.Ct. 1843, 1849, 152 L.Ed.2d 914 (2002) (citations omitted). The statute provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,

28 U.S.C. § 2254(d).

As the Supreme Court explained in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), a state court's legal decision is "contrary to" clearly established federal law under § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13, 120 S.Ct. at 1523. An "unreasonable application" occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S.Ct. at 1523.

Under this standard, a state court decision is not unreasonable simply because the federal court concludes that the decision is erroneous or incorrect. *Id.* at 411, 120 S.Ct. at 1522. Rather, the federal court must determine the state court's decision applies federal law in an objectively unreasonable manner. *Id.* at 410–12, 120 S.Ct. at 1522–23. Finally, the *Williams* Court emphasized that "clearly established Federal law, as determined by the Supreme Court" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the

relevant state-court decision." *Id.* at 412, 120 S.Ct. at 1523.

### III. DISCUSSION

Davis raised and received a certificate of appealability for nineteen claims. Because his claims overlap to a certain extent, we will group and consider his claims in a manner similar to that used by the district court.

#### A. Effective Assistance of Counsel

Davis' first, forth, fifth, sixth, and seventh claims contend Davis was denied effective assistance of counsel during his trial and during his direct appeal. The Sixth Amendment to the Constitution provides a criminal defendant "the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court held a defendant is considered to have been deprived of the right to counsel where he can demonstrate "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment [and that] ... the deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. at 2064.

As to the performance prong of *Strickland,* a defendant must demonstrate his lawyer's performance fell below an objective standard of reasonableness. *Id.* at 689, 104 S.Ct. at 2064. An attorney's actions are to be examined just as they were executed, without the benefit of hindsight. *See Combs v. Coyle,* 205 F.3d 269, 278 (6th Cir.2000) ("Judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight.'") (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065). Where counsel proceeds according to an objectively reasonable strategy, his performance is generally deemed effective. *See Miller v. Francis,* 269 F.3d 609, 615–16 (6th Cir.2001). As to the prejudice prong, the *Strickland* Court elaborated, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674. The *Strickland* Court defined "a reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.*

Davis' first and fifth claims allege he was denied effective assistance of trial counsel because his attorney, Ernest White, had a conflict of interest that prevented him from calling Davis' first appointed attorney, Michael Renfro, as a witness in Davis' defense. Davis contends the Michigan courts erred in holding there was no conflict of interest and in denying his effective assistance of counsel claim.

In order to establish a conflict of interest, Davis must point to specific instances in the record to suggest an actual conflict or impairment of his interests. *United States v. Hall,* 200 F.3d 962, 965–66 (6th Cir.2000). There is no violation of his right to effective assistance of counsel where the conflict is irrelevant or merely hypothetical; there must be an actual significant conflict. *Id.* Further. Davis must also show the conflict adversely affected his lawyer's performance and caused him to make bad choices for him. *Id.* When an actual conflict of interest exists, prejudice is presumed. *Id.*

Davis wanted Renfro to testify at trial that Davis asked him to run a newspaper advertisement to seek alibi witnesses, that Renfro advised against that approach, and that the defense produced certain tele-

phone records that were introduced at trial by the prosecution. White, Davis' second attorney, was uncomfortable with the prospect of calling Renfro as a witness because they were partners in Felony Defense Counsel, a corporation that accepts appointed criminal cases. After a pretrial hearing on White's motion to withdraw, the trial court held Renfro's testimony would not be relevant to Davis' alibi and White therefore would not face a conflict of interest in representing Davis because Renfro would not testify.

Davis cannot show a significant actual conflict of interest impaired the representation White provided him during trial. When the trial court ruled Renfro's proposed testimony would be irrelevant and inadmissible, White's hypothetical conflict underlying his motion to withdraw vanished. Thus, there is no merit to Davis' ineffective assistance claims that allege a conflict of interest.

■ The fourth, sixth, and seventh claims allege Davis received ineffective assistance of counsel from his lawyers at trial and on direct appeal. To succeed on these claims, Davis must show the Michigan courts applied *Strickland* to the facts of his case in an objectively unreasonable manner. *Bell v. Cone*, 535 U.S. 685, 699, 122 S.Ct. 1843, 1852, 152 L.Ed.2d 914 (2002). Davis claims the following conduct amounts to ineffective assistance of trial counsel: Renfro's failure to fully investigate the alibi defense; White's failure to examine Davis regarding his desire to seek alibi witnesses early in the case; White's failure to obtain the victim's telephone records for the evening she was killed to show she paged Davis between 6:30 p.m. and 7:15 p.m.; White's failure to impeach Melissa Peters based on her criminal history; White's failure to impeach Christopher Hanner based on his inconsistent statements; White's failure to object to al-

legedly perjured testimony; and appellate counsel's failure to raise certain claims, to timely seek an evidentiary hearing, and to secure the right to oral argument.

Davis has failed to show Michigan courts unreasonably applied *Strickland* in denying the claims he raised challenging the performance of his attorneys. The Michigan Court of Appeals held Davis could not show he was prejudiced when Renfro declined to seek alibi witnesses via the newspaper because it was speculative whether any might be identified. It held White elicited significant alibi evidence from Davis and the decision not to inquire about Renfro's failure to further investigate the alibi defense was a reasonable decision as a matter of trial strategy. It also concluded there was no ineffective assistance of counsel in the failure to obtain the victim's telephone records because Davis did not demonstrate such records would establish anything that could have changed the result of his trial. Likewise, Davis did not show he was prejudiced by the failure to impeach Melissa Peters generally with her prior criminal history because defense counsel impeached her with her prior inconsistent statements and the fact she testified against Davis in exchange for pleading to a reduced charge. Neither did Davis show White fell below an objective standard of reasonableness when he did not use minor inconsistencies to impeach Christopher Hanner. Further, Davis did not show particular witnesses testified falsely, so his counsel's failure to object to such testimony does not constitute ineffective assistance of counsel. Finally, the Michigan trial court reasonably held Davis did not show his appellate counsel fell below an objective standard of reasonableness in representing him on direct appeal. Because Davis has not shown *Strickland* was applied in an objectively unreasonable manner to his case, we affirm the district

court's denial of habeas relief on his assistance of counsel claims.

## B. "Other Acts" Evidence and Fair Trial

In his second claim, Davis contends the trial court erred by admitting evidence of prejudicial, extrinsic acts and that the error deprived him of a fair trial. To obtain habeas relief on this claim, Davis must show the erroneous admission of "bad acts" evidence had a substantial and injurious effect or influence on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993); *Ford v. Curtis*, 277 F.3d 806, 811 (6th Cir.2002). The trial court admitted evidence of Davis' marital discord, his threat to kill his estranged wife, his girlfriend's bruised cheek in the days after the murder, and the inappropriate intimate relationship between Davis (44 years old) and Melissa Peters (18 years old). On direct appeal, the Michigan Court of Appeals held the trial court did not err in admitting this evidence because it was either related to the crime charged and thus not "other acts" evidence, it served to show intent or motive, or it was relevant to whether Peters had reason to act in concert with Davis. Even if Davis could demonstrate an error, he nevertheless failed to show the evidence had a substantial and injurious effect on the jury's verdict which could not be explained by the other evidence in the case. Because Davis has not made that showing, the district court did not err in denying habeas relief on this ground.

## C. Prosecutorial Misconduct and Fair Trial

Davis argues in his third, ninth, eleventh, twelfth, and thirteenth claims that certain conduct of the prosecutor deprived him a fair trial and entitles him to habeas relief. Misconduct on the part of the prosecution violates a defendant's due process rights where the misconduct "so infec[ts] the trial with unfairness as to make the resulting conviction a denial of due process." *Greer v. Miller*, 483 U.S. 756, 765, 107 S.Ct. 3102, 3109, 97 L.Ed.2d 618 (1987). A prosecutor's actions are said to infect a trial with unfairness where, when viewed in the context of all of the evidence presented at trial, they "undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." *United States v. Young*, 470 U.S. 1, 16, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985). "[T]he touchstone of due process analysis ... is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982). On habeas review, our role is to determine whether the conduct was "so egregious so as to render the entire trial fundamentally unfair." *Cook v. Bordenkircher*, 602 F.2d 117, 119 (6th Cir.1979).

Davis contends in his third claim the prosecutor improperly cross-examined him by asking whether he thought other witnesses were mistaken or lying, but Davis has not shown this conduct was so egregious as to make the entire trial fundamentally unfair. Appellant also challenges two inflammatory comments the prosecutor made: asking Davis whether he thought he was Wyatt Earp or Clint Eastwood for owning a .44 caliber handgun with a fast draw holster, and sarcastically noting Davis could have spent more time with his "precious" daughter if he were not making arrangements for his girlfriend to case the victim's house in the hours before the murder. While these comments were not warranted, neither did they make the trial fundamentally unfair. To determine whether the prosecutor's comments undermined the fairness of the trial, we look to "the degree to which the remarks com-

plained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury and the strength of the competent proof to establish the guilt of the accused." *Hamblin v. Mitchell,* 354 F.3d 482, 495 (6th Cir.2003). The complained-of insults were not so incendiary as to inflame the jury's passions or distract them from the specific question of Davis's guilt or innocence. *See Hutchison v. Bell,* 303 F.3d 720, 750 (6th Cir.2002) (denying habeas claim of prosecutorial misconduct based on references to defendant as a "Judas goat" and another as "an evil force" that led a "drug empire"). Nor did the prosecutor misstate the evidence, reference evidence that was inadmissible or otherwise prejudicial, or attempt to undermine the presumption of innocence or downplay the jury's role. *Compare United States v. Bond,* 22 F.3d 662, 669 (6th Cir.1994) (finding prosecutorial misconduct based prosecutor impugning defendant's failure to testify in his own defense). Although the prosecutor's questions and comments were unnecessarily sarcastic, this sarcasm was not the touchstone of the State's case. And these three comments were fleeting, especially given that the State marshaled the eyewitness testimony of Peters to link Davis to the murder. *Cf. Macias v. Makowski,* 291 F.3d 447, 454 (6th Cir.2002) (finding no prosecutorial misconduct when "the prosecutor's statements were isolated and the evidence against [the defendant] was strong"). Ultimately, the prosecutor's conduct, even if inappropriate, did not implicate the presumption of innocence, the jury's role as the sole arbiter of the facts, or the specific question of guilt or innocence that the jury faced, and thereby did not eviscerate the fairness of Davis's trial.

■ In his ninth claim Davis argues the prosecution knowingly used false or perjured testimony, thereby denying him a fair trial. To prevail on this claim, Davis must show (1) the challenged statement was actually false, (2) the statement was material, and (3) the prosecution knew it was false. *Coe v. Bell,* 161 F.3d 320, 343 (6th Cir.1998). It is not sufficient for a statement to be merely misleading or inconsistent; it must be indisputably false. *Byrd v. Collins,* 209 F.3d 486, 517–18 (6th Cir.2000). Davis cannot sustain this claim because he has not shown any of the alleged perjury to be indisputably false. Davis identifies inconsistencies in the testimony or discrepancies between the testimony and his version of the facts, but this is not enough to show the prosecution knowingly used perjured testimony or denied him a fair trial.

■ Davis' eleventh claim challenges an inference the prosecutor argued to the jury during closing argument, contending the prosecution relied on matters not in evidence. Based on testimony regarding a phone conversation between Davis and the victim the morning of the killing and the subsequent events of the day, the prosecutor suggested the conversation was about their custody dispute. Prosecutors are allowed to argue reasonable inferences from the evidence, but they are prohibited from arguing facts to the jury that are prejudicial and not introduced as evidence. *Byrd v. Collins,* 209 F.3d 486, 535 (6th Cir.2000). This was a reasonable inference from the evidence and did not render Davis' trial fundamentally unfair. The inference was reasonable given that Davis and the victim were engaged in an ongoing and contentious custody battle. Because evidence indicated that their conversation that morning was similarly contentious, it is at least plausible to assume that the source of the dispute in that conversation was the same

as the source of their past disputes–the custody fight.

■ The twelfth claim relates to the introduction of a phone bill as evidence, which indicated Davis was closer to the crime scene than he initially would concede. The phone bill was a proposed defense exhibit, but it was introduced during the prosecution's case and marked People's Exhibit # 275. Davis contends the prosecution introduced the bill to mislead the jury to believe the prosecution discovered the phone bill and thereby caused Davis to modify his story regarding his whereabouts on the night of the murder. The prosecution argued in its closing Davis did not change his story until after the prosecution had the phone bill. Davis states the prosecution did not discover the phone bill on its own and any inference otherwise misled the jury and rendered his trial unfair. Whether the defense or prosecution discovered or introduced the phone bill is of little consequence. The timing by which the phone bill became evidence and the prosecutor's inference Davis changed his story to accommodate the phone bill did not deprive Davis of a fundamentally fair trial. Just as important, if not more important, than the chronology or cause of the modification of Davis's story was the fact that it had been modified: inconsistent statements tend to impeach one's credibility; even if Davis himself discovered the evidence that led him to change his story, it would not have changed the negative inferences arising from the change in his story.

■ In his thirteenth claim, Davis contends the prosecutor failed to disclose *Brady* material and thereby denied him a fair trial. The rule of *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963), requires the prosecution upon request to turn over to a defendant evidence in its possession that is fa-

vorable to the accused and is also material to guilt or punishment. Violation of this rule undermines a conviction if there is a reasonable probability disclosure of the evidence would have led to a different result. *Coe v. Bell,* 161 F.3d 320, 344 (6th Cir. 1998). Davis contends the prosecution violated *Brady* when it withheld his girlfriend's criminal record, which he could have used to impeach her, and when it failed to comply with his request to subpoena the victim's phone records. Because disclosure of these materials would probably not have changed the result of Davis' trial, the evidence is not considered material and there was no violation of *Brady*. See *Buell v. Mitchell,* 274 F.3d 337, 361–62 (6th Cir.2001). Davis knew and used evidence to effectively impeach his girlfriend, including her conflicting statements to police and her testimony in exchange for a plea agreement. Despite Davis' hope, the phone records would not establish either his location when the victim allegedly paged him, or the time of her death. Neither would they establish whether the victim or someone else placed any particular call, as Davis or his girlfriend could have used the victim's phone while they were in the home. Davis has not shown he was denied a fair trial due to any *Brady* violation.

### D. Actual Innocence

■ Davis contends in his eighth and sixteenth claims new evidence demonstrates he is actually innocent of the charges for which he was convicted. However, "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.... [F]ederal habeas courts sit to ensure that individuals are not imprisoned in violation

of the Constitution–not to correct errors of fact." *Herrera v. Collins*, 506 U.S. 390, 400, 113 S.Ct. 853, 860, 122 L.Ed.2d 203 (1993). Instead of using new evidence to show a constitutional violation for which he could have habeas relief, Davis contends the new evidence shows certain trial testimony was false and establishes, by way of a notation on the death certificate, the victim died before he could have been at her residence. Because these two claims are not proper grounds on which to provide habeas relief, we affirm the district court's result on this issue. In any event, the new evidence that Davis presents–the victim's death certificate–would not necessarily suggest his innocence. The victim's death certificate listed her time of death at 7:15 p.m., which Davis contends, in light of the other evidence of his whereabouts that night, made it impossible for him to have been at the victim's house at the time she was killed. But at trial, the medical examiner noted that he was unable to give an exact time of death; the doctor testified to an "official" time of death of 7:15 but noted the imprecision. The death certificate, then, adds nothing new to the evidence from trial, and to the extent that inferences over the time of death did not convince the jury, the reaffirmation of these inferences hardly changes the factual picture.

### E. Right to Present a Defense

■ Davis contends in his tenth and fourteenth claims the trial court denied his right to present a defense because he was prevented from calling his first attorney, Michael Renfro, to testify and he was unable to present evidence to show his girlfriend, Melissa Peters, was the only murderer. A defendant's right to present testimony of witnesses and to present his version of the facts is a fundamental element of due process of law. *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). However,

presenting a defense is limited by the proper application of the rules of evidence. "Errors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Roe v. Baker*, 316 F.3d 557, 567 (6th Cir.2002). The trial court ruled the testimony Davis wanted to elicit from Renfro was collateral to the issues at trial and would have added little to the alibi Davis sought to establish. As to evidence Melissa Peters was the only person involved in the crime, Davis presented evidence and argument she had access to the items associated with the killing and the victim thought Peters followed her to work the same day she was killed. The trial court prevented a defense witness, however, from sharing the victim's speculation Peters might harm her if Davis did not do so. Even if Davis demonstrated these rulings were erroneous, Davis has not shown the trial court perniciously affected his ability to present a defense and thereby deny his fundamental right to a fair trial. Although the victim's expressed fears of Peters were surely more dramatic than evidence that Peters followed the victim to work on the day of the murder, the fact that some evidence of the victim's fear of Peters was allowed, combined with Peter's admitted role in the murder, gave Davis a sufficient foundation to point the finger at Peters. Ultimately, moreover, the jury's decision to convict Davis meant that they believed the testimony of Peters; it is unlikely that the victim's explicit speculation about what Peters might do would have otherwise dissuaded the jury from believing her.

### F. Cumulative Error

■ In his fifteenth claim, Davis asserts the cumulative effect of errors denied him a fair trial and resulted in a miscar-

riage of justice. Cumulative error is not a basis for granting habeas relief in noncapital cases. *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir.2002) ("The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief. Thus, it cannot be said that the judgment of the Ohio courts is contrary to ... any ... Supreme Court decision so as to warrant relief under the AEDPA.").[1] Thus, we will affirm the district court's denial of habeas relief on this ground.

### G. Alleged Defects in State Postconviction Proceedings

 In his seventeenth, eighteenth, and nineteenth claims, Davis seeks habeas relief on the basis of alleged defects in his postconviction proceedings in Michigan courts. States have no federal constitutional obligation to provide postconviction remedies, *Pennsylvania v. Finley*, 481 U.S. 551, 557, 107 S.Ct. 1990, 1994, 95 L.Ed.2d 539 (1987), and we have previously concluded habeas corpus cannot be used to challenge errors or deficiencies in state postconviction proceedings. *Alley v. Bell*, 307 F.3d 380, 386–87 (6th Cir.2002); *Kirby v. Dutton*, 794 F.2d 245, 247–48 (6th Cir. 1986); *see also Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir.2001). Therefore Davis cannot seek habeas relief on these three claims.

### IV. CONCLUSION

Based on the foregoing, we **AFFIRM** the judgment of the district court.

---

1. Cumulative error can be the basis of habeas relief in capital cases. *E.g.,* in *DePew v. Anderson*, constitutional errors that might have been harmless, taken individually, were cumulated by this Court, leading to a reversal of a death sentence. 311 F.3d 742, 751 (6th Cir.2002) (distinguishing cases in which a death sentence was imposed from other cases).