*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0208p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JOE D'AMBROSIO,
　　　　*Petitioner-Appellee/Cross-Appellant,*

　　　*v.*

MARGARET BAGLEY, Warden,
　　　　*Respondent-Appellant/Cross-Appellee.*

> Nos. 06-3542/3712

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 00-02521—Kathleen McDonald O'Malley, District Judge.

Argued: July 19, 2007

Decided and Filed: June 5, 2008

Before: BOGGS, Chief Judge; GIBBONS and ROGERS, Circuit Judges.

---

### COUNSEL

**ARGUED:** Stephen E. Maher, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Appellant. John Q. Lewis, JONES DAY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Stephen E. Maher, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Appellant. John Q. Lewis, Edward J. Sebold, JONES DAY, Cleveland, Ohio, for Appellee.

　　　ROGERS, J., delivered the opinion of the court, in which GIBBONS, J., joined. BOGGS, C. J. (p. 11), delivered a separate opinion dissenting in part.

---

### OPINION

---

　　　ROGERS, Circuit Judge. Joe D'Ambrosio was convicted of murdering Anthony Klann in 1988. After D'Ambrosio discovered evidence that the prosecution had withheld during his trial, he amended his then-pending habeas petition to add a *Brady* claim. The district court granted the writ. On appeal, the warden argues, for the first time, that D'Ambrosio failed to exhaust his *Brady* claim and should be required to return to state court to relitigate the claim there. Although D'Ambrosio's *Brady* claim was not presented to a state court, we do not dismiss his petition because the warden expressly waived the exhaustion requirement. *See* 28 U.S.C. § 2254(b)(3). The warden also challenges the district court's decision on the merits and D'Ambrosio cross-appeals with respect to other issues. For the reasons given by the district court on issues presented to this court, we affirm.

1

## I.

The Supreme Court of Ohio described the underlying facts of this case:

On Friday evening, September 23, 1988, at approximately 7:30 p.m., Anthony Klann ("victim") and Paul "Stoney" Lewis visited a Cleveland area bar called The Saloon. At that time, Lewis encountered Thomas "Mike" Keenan, a former employer of his, whereupon the two engaged in a conversation, left the bar in Keenan's truck, and went to another bar nearby called Coconut Joe's. Shortly thereafter, Klann, Edward Espinoza and defendant-appellant, Joe D'Ambrosio, arrived at Coconut Joe's.

Lewis testified that Espinoza took the victim into the men's restroom two or three times, and that he could hear Espinoza yelling at the victim while he (Lewis) was seated at the bar. However, during his own testimony, Espinoza denied that he argued with the victim at that time. Lewis stayed at Coconut Joe's until approximately 10:45 p.m. or 11:45 p.m.

Espinoza testified that at approximately 1:30 a.m., Saturday, September 24, he, Keenan and defendant also left the bar. Espinoza and defendant went to defendant's apartment; however, before they entered, Keenan pulled up in his truck and asked the two to help him find Lewis so he could get back drugs that he claimed Lewis had stolen from him. Defendant and Espinoza went into the defendant's apartment, whereupon Espinoza armed himself with a baseball bat and defendant picked up a knife. Espinoza assumed this knife was in addition to one that defendant usually carried. Defendant and Espinoza joined Keenan in his truck, and the three rode around the Coventry and Murray Hill area looking for Lewis.

Carolyn Rosel testified that at approximately 3:00 a.m., she and a friend, James Russell (a.k.a. "Foot" or "Lightfoot"), were awakened by banging on their door. They went to the door and let Keenan, Espinoza and defendant inside, whereupon Keenan asked where Lewis was. At that time, Keenan and Espinoza told Rosel and Russell that they wanted to kill Lewis because he had "ripped Michael [Keenan] off." After about fifteen to twenty minutes, the three left.

According to Espinoza's testimony they then resumed their search for Lewis in Keenan's truck. Soon the three saw the victim walking next to the road they were traveling on and hailed him. When the victim approached the truck, Keenan forced him into the backseat next to defendant. The victim was asked where Lewis was, but he said he didn't know. While the three interrogated the victim, Espinoza hit him on the head with a baseball bat. The victim told them where Lewis lived, and Keenan drove to Lewis's apartment building and knocked on what he thought was Lewis's door.

Mimsel Dandec and her boyfriend, Adam Flanik, lived in the same apartment building as Lewis. At approximately 3:30 a.m. on the date in question, Dandec and Flanik were awakened by what they described as screaming, shouting and banging outside. Dandec testified that she heard someone yell, "I want my dope" or "my coke." Flanik went to investigate and found Keenan pounding on another apartment door in search of Lewis. After Flanik directed Keenan to Lewis's door, Keenan and Espinoza kicked it in while they repeatedly declared that they were going to kill Lewis. Lewis was not in his apartment at that time, so Keenan and Espinoza got back in the truck and drove off.

Meanwhile, defendant had stayed in the truck with the victim during the incident at Lewis's apartment building. Flanik testified that defendant had a large knife poised within inches of the victim's face. Flanik also testified that the victim "looked like he had been crying," and "like he had been roughed up a little bit."

Russell testified that Espinoza returned to his home and asked whether Lewis had been there. Espinoza then told Russell to "tell Stoney we got a contract out on him," and that he had the victim in the truck and that he was "dead meat." Rosel testified that Espinoza said that they had the victim, and were "going to do him in, and drop him off."

Thereafter, according to Espinoza's testimony, Keenan drove the group to Doan's Creek and pulled his truck off the road near the bank of the creek. Keenan got out of the truck, pulled the victim out and made him walk behind the truck. Keenan asked the victim repeatedly where Lewis was, but the victim stated he didn't know. Keenan told the victim to put his head back, whereupon Keenan took D'Ambrosio's large knife, cut the victim's throat and pushed him into the creek.

When the victim got up and began to run, Keenan said, "finish him off." The defendant grabbed the knife from Keenan and pursued the victim. Within a minute or two, Espinoza testified, the victim screamed, "please don't kill me," but defendant caught him and killed him.

Still, according to Espinoza's testimony, the trio then went to defendant's apartment, where defendant changed clothes, and proceeded to Keenan's room at the Turfside Motel. Espinoza testified that at that time Keenan "made us some story that we were supposed to keep to. * * * [O]ne was that we'd dropped off [the victim] earlier that night after we were done partying, and he went on his way. * * * Then the other story was that we never ran into [the victim]."

At approximately 1:00 or 1:30 p.m. later that day, a jogger found the victim's corpse in Doan's Creek.

On the morning of Sunday, September 25, an autopsy was performed by the Cuyahoga County Coroner, Dr. Elizabeth K. Balraj. The coroner testified that she found three stab wounds on the victim's chest, and that his windpipe had been perforated in two places by a throat cut. In addition, she found some defense wounds on the victim, which are usually sustained on the hands or arms while trying to block a stabbing. The coroner stated that all the knife wounds could have been caused by State's Exhibit 8A, but that it was possible that another knife could have been involved in the murder.

The coroner further testified that the evidence was "consistent" with the conclusion that the victim died the day before the autopsy, but that it was "possible" that the victim died forty-eight hours before the autopsy.

On October 6, 1988, defendant, Keenan and Espinoza were jointly indicted on four separate counts of (1) aggravated murder with prior calculation and design, R.C. 2903.01(A); (2) aggravated felony murder, R.C. 2903.01(B); (3) kidnapping, R.C. 2905.01; and (4) aggravated burglary of Lewis's apartment, R.C. 2911.11.

Defendant's trial commenced on February 6, 1989 before a three-judge panel. On February 9, the trial court sealed a verdict finding defendant guilty on all counts charged in the indictment. (The verdict was announced February 21, after the

conclusion of Keenan's trial.)  On February 23, 1989, the panel found that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt.  Consequently, the court sentenced defendant to death on both aggravated murder counts.

*State v. D'Ambrosio*, 616 N.E.2d 909, 911-12 (Ohio 1993).  The Supreme Court of Ohio affirmed D'Ambrosio's conviction, *id.* at 921, and, following a remand to the court of appeals permitting D'Ambrosio to supplement the record, affirmed D'Ambrosio's sentence, *State v. D'Ambrosio*, 652 N.E.2d 710, 715-16 (Ohio 1995).

On March 30, 2001, D'Ambrosio filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Ohio.  In his original petition, D'Ambrosio included four claims that are relevant to this appeal:  (1) that he is actually innocent, (2) that he did not knowingly waive his right to a jury trial, (3) that his counsel was constitutionally ineffective for failing to ask for the recusal of one of the judges who served on the three-judge panel that convicted and sentenced him, and (4) that the State failed to preserve certain evidence which D'Ambrosio argued may have exonerated him.

On September 19, 2002, D'Ambrosio moved to amend his petition to add a *Brady* claim based on newly-discovered evidence.  As recounted by the district court, D'Ambrosio claimed that the State failed to disclose numerous pieces of evidence:

(1) evidence that Lewis allegedly raped Klann's roommate, Christopher Longenecker, that Klann had some knowledge of it, and that Lewis was never prosecuted for it;

(2) evidence that police identified Lewis as an anonymous caller who called to [identify] Klann as the victim and knew information regarding the crime that had not yet been published in the newspaper;

(3) the fact that Lewis, in exchange for his testimony, asked police to aid him in resolving a Driving While Under the Influence (hereinafter "DUI") charge;

(4) evidence that Detective Leo Allen, the leading investigating detective on the Klann murder case, reported a burglary of Lewis's apartment several days *after* Lewis claims he had reported it to police;

(5) evidence that police learned there was bloody clothing in Keenan's garage;

(6) evidence that the initial investigating detectives on the scene, Ernest Hayes and Melvin Goldstein, believed that Klann was murdered elsewhere and that his body was dumped in Doan's Creek;

(7) evidence that a cassette tape containing information "implicating others in this crime" was made by Angelo Crimi;

(8) evidence that James Russell and Carolyn Rosel requested help from police in relocating after trial because some individuals, who they believed to be D'Ambrosio's brothers, had threatened them;

(9) evidence from the Trace Evidence Department that Klann was not wearing shoes or undershorts when his body was discovered;

(10) evidence that the Cleveland Heights Police Department's dispatch log showed that there was a disturbance in the area of Coconut Joe's on Thursday evening/Friday morning;

(11) evidence that Therese Farinacci, one of Lewis's neighbors, was awakened at around 4:10 a.m. on Saturday morning and that another couple heard someone say "Let's dump the body" on that same night;

(12) evidence that Linda DeBlasis Hudak stated she saw Klann alive late on Friday evening; and,

(13) evidence that, while police claimed to have searched Keenan's truck, the company that repossessed his truck subsequently found cocaine in it.

*D'Ambrosio v. Bagley*, No. 1:00-cv-02521, 2006 WL 1169926, at *16 (N.D. Ohio Mar. 24, 2006) (paragraph breaks added). In July of 2004, the district court held a three-day evidentiary hearing, which focused on D'Ambrosio's *Brady* claim.

On March 24, 2006, the district court granted D'Ambrosio's petition for a writ of habeas corpus.[1] The court held that most of the evidence that D'Ambrosio introduced to support his *Brady* claim was suppressed by the prosecution and favorable to the defense.[2] The court further held that most of this suppressed evidence was material,[3] and that D'Ambrosio was able to demonstrate cause and prejudice to overcome his failure to raise the *Brady* claim in state court. The district court, however, rejected D'Ambrosio's other grounds for relief.

The district court granted D'Ambrosio a certificate of appealability on the following issues upon which the court ruled against D'Ambrosio: (1) whether D'Ambrosio is actually innocent, (2) whether D'Ambrosio knowingly waived his right to a jury trial, (3) whether counsel for D'Ambrosio was constitutionally ineffective for failing to ask for the recusal of one of the trial judges, and (4) whether D'Ambrosio was denied due process because the prosecution failed to preserve certain evidence that D'Ambrosio argues may have exculpated him.

## II.

The warden appeals the district court's decision on the ground that D'Ambrosio failed to exhaust his *Brady* claim in state court. The warden did not raise exhaustion before the district court, and the district court, although noting that "the state's failure to raise exhaustion does not invariably waive the defense," refused to engage in a sua sponte analysis. *D'Ambrosio*, 2006 WL 1169926, at *13 n.8. Specifically, with respect to the *Brady* claim, the district court noted that because a motion for post-conviction relief would be untimely, that because "throughout this rather lengthy habeas proceeding, the [warden] has never asserted an exhaustion defense," and that because the

---

[1] On April 14, 2006, the district court amended its judgment to clarify that it was ordering respondent to set aside D'Ambrosio's convictions and sentences "as to all counts of the indictment" if the State chose not to retry D'Ambrosio.

[2] The district court held that D'Ambrosio failed to demonstrate that the bloody clothing in Keenan's garage was exculpatory. *D'Ambrosio*, 2006 WL 1169926, at *22-23. The court also held that the Cleveland Heights Police Department log, which indicated a disturbance at Coconut Joe's on Friday morning, was not suppressed. *Id.* at *28.

[3] The district court concluded that No. 8 listed above (evidence that Russell and Rosel asked for help relocating) was not material. *D'Ambrosio*, 2006 WL 1169926, at *33.

State was responsible for suppressing *Brady* evidence, "the State cannot now assert D'Ambrosio's failure to exhaust this claim as a bar to this Court's review of it." *Id.* at *19 n.14.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") states that a federal court cannot grant a writ of habeas corpus to a prisoner held in state custody unless "(A) the applicant has exhausted the remedies available in the courts of the State; or (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1). Under AEDPA, the "State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." § 2254(b)(3). In this case, it is undisputed that the warden was aware of, but never argued to the district court, D'Ambrosio's failure to exhaust his state remedies.

D'Ambrosio never presented his *Brady* claim to a state court. D'Ambrosio offers three arguments for why this court should nonetheless address the merits of the claim: (1) the warden expressly waived the exhaustion requirement; (2) there is no state process through which D'Ambrosio could obtain relief; and (3) "[t]he interests of comity, federalism, and justice" are not served by requiring D'Ambrosio to return to state court.

We conclude that the warden expressly waived the exhaustion requirement, and we need not address D'Ambrosio's alternative arguments. AEDPA does not explain how a state "expressly waives" the exhaustion requirement, but says only that the state cannot be deemed to have waived the requirement unless it expressly waived the requirement. "Waiver" is traditionally defined as an "intentional relinquishment or abandonment of a known right." *See, e.g.*, *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Courts also generally agree that "express" is synonymous with "clear" or "unambiguous." For example, in the context of statutory waivers of sovereign immunity, courts alternatively define an "express waiver" as "a 'clearcut' waiver, a 'specific' waiver, an[] 'explicit' waiver, an 'unequivocal' waiver, a 'plain' waiver, a 'manifest' waiver, an 'affirmative' waiver, an 'unambiguous' waiver, or a waiver described by a combination of these adjectives." *Shaw v. Library of Congress*, 747 F.2d 1469, 1478 (D.C. Cir. 1984).[4] Similarly, in determining whether Congress has permitted state regulation that otherwise would violate the negative implications of the Commerce Clause, this court noted that,

> While the [Supreme] Court has generally required an express statement of Congressional policy to allow otherwise impermissible regulation of interstate commerce, "[t]here is no talismanic significance to the phrase 'expressly stated', however; it merely states one way of meeting the requirement that for a state regulation to be removed from the reach of the dormant Commerce Clause, congressional intent must be *unmistakably clear*."

*L.P. Acquisition Co. v. Tyson*, 772 F.2d 201 (6th Cir. 1985) (quoting *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91 (1984)) (emphasis added). *See also Kelly v. Lee's Old Fashioned Hamburgers, Inc.*, 908 F.2d 1218, 1220 (5th Cir. 1990) (en banc) (holding that the requirement in Federal Rule of Civil Procedure 54(b) that the district court make "an express determination that there is no just reason for delay and . . . an express direction for the entry of judgment" in order to direct the entry of a final judgment to fewer than all of the parties in a multi-party case is met where the record "reflects the district court's *unmistakable intent* to enter a partial final judgment" (emphasis added)).

---

[4] The specific holding of the D.C. Circuit, that the immunity of the United States from awards for interest was waived by general statutory language waiving immunity for attorneys' fees, was reversed by the Supreme Court. *Library of Congress v. Shaw*, 478 U.S. 310 (1986). Congress later specifically provided for interest in the particular context at issue in *Shaw*. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 251 (1994)

The warden expressly waived the exhaustion requirement because her counsel's conduct during the district court proceedings manifested a clear and unambiguous intent to waive the requirement. In response to D'Ambrosio's motion to amend his habeas petition in order to add the *Brady* claim, the warden stated that she took no position on the motion, but requested the opportunity to file a response if the district court granted the motion to amend. On October 25, 2002, the warden filed a motion to expand the record to include evidence that the warden argued undermined D'Ambrosio's *Brady* claim. On November 25, 2002, the district court granted both motions. Importantly, with respect to D'Ambrosio's motion to amend his habeas petition, the district court stated that its understanding was that the warden would not argue that the *Brady* claim was unexhausted:

> Based on the motion briefs and conversations with counsel, the Court finds this claim is exhausted, as Petitioner is without an available state-court remedy. Thus, the Court grants the instant motion without concern that Respondent will subsequently move to dismiss the Petition for failure to exhaust the amended claim. In so granting, however, the Court reserves Respondent's right to assert that the claim is procedurally defaulted, if appropriate, in the supplemental return of writ.

Furthermore, in her Amended Return of Writ, the warden argued that D'Ambrosio's petition contained procedurally defaulted claims because the claims were "never presented in state court" and "if now [were] presented, would be found untimely by the state courts."

This is an extraordinary case in which the district court stated that it understood exhaustion to be a non-issue and that the warden would not later assert it, the warden failed to correct what the district court clearly viewed as the warden's position during the almost four years of litigation before that court, and the warden went on to state to the district court that D'Ambrosio's claims would be untimely in the state courts (thereby confirming the district court's understanding). We are aware of no binding authority that says that such conduct by the State is not an express waiver of the exhaustion requirement. Furthermore, the Eighth Circuit held, in a case somewhat analogous to this one, that a state expressly waived the exhaustion requirement by stating in a district court brief that it had conceded exhaustion in a prior motion to dismiss, even though the circuit court's review of the motion to dismiss revealed no concession. *Kerns v. Ault*, 408 F.3d 447, 449 n.3 (8th Cir. 2005). *But see Dreher v. Pinchak*, 61 F. App'x 800, 802-03 (3d Cir. 2003) (holding that the state's concession of exhaustion in its answer to the petition for writ of habeas corpus did not expressly waive the exhaustion requirement because the "policy justifications" of that requirement counseled in favor of a "stringent standard for proving waiver of exhaustion").

It is no answer to say that the warden did not expressly waive exhaustion because the warden did not verbally state that she was waiving the requirement. AEDPA does not require "magic words" in order for a state to expressly waive exhaustion. The touchstone for determining whether a waiver is express is the clarity of the intent to waive. Obviously, had the warden's counsel said, "we waive the exhaustion requirement," the intent would have been clear. But there is nothing more than a metaphysical distinction between that hypothetical situation and the instant case—in both cases it is clear that the warden intentionally gave up her right to raise exhaustion. *Cf. Shaw*, 747 F.2d at 1478 ("There is nothing talismanic in the word 'express,' . . . ."). AEDPA requires that the waiver be express, not expressed in a certain manner.

Finally, this is not a case in which the State simply failed to raise the exhaustion requirement in the district court. This court has held that such simple failure does not, by itself, expressly waive the issue. *See Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004); *Jackson v. Jamrog*, 411 F.3d 615, 618 (6th Cir. 2005); *Rockwell v. Yukins*, 217 F.3d 421, 424 (6th Cir. 2000). Nor does the fact that the warden participated in discovery and moved to expand the record indicate, by itself, that the warden expressly waived the exhaustion requirement, as D'Ambrosio argues. These actions were

merely ancillary to the warden's opposition to the merits of D'Ambrosio's *Brady* claim, and do not indicate express waiver any more than participation in briefing and oral argument. Instead, it is the statements made by the warden, in addition to these facts, that constitute an express waiver.[5]

## III.

For the reasons given in those parts of the district court's thorough, thoughtful, and well-reasoned opinion applicable to the issues certified for appeal, D'Ambrosio has demonstrated that the prosecution suppressed material exculpatory evidence and that neither § 2254(e)(2) nor procedural default precluded the district court's consideration of those claims. *D'Ambrosio*, 2006 WL 1169926, at *16-33. We therefore affirm the district court's order.[6] Accordingly, a full-blown discussion of the merits would serve no jurisprudential purpose.

---

[5]Because we conclude that the warden expressly waived the exhaustion requirement, we do not address D'Ambrosio's alternative arguments that there is no available state remedy that he could pursue and that this court does not have to dismiss a petition containing an unexhausted claim because the prudential reasons for exhaustion are inapplicable in this case.

We are skeptical of the warden's argument that a petition for post-conviction relief pursuant to Ohio Revised Code ("ORC") § 2953.21 is an available remedy. A petition for post-conviction relief filed this late after the direct appeal would only be considered timely if D'Ambrosio could "show[] by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found [him] guilty of the offense of which [he] was convicted." ORC § 2953.23(A)(1)(b); *see also* ORC § 2953.21(A). But to succeed on a *Brady* claim, D'Ambrosio needs to demonstrate merely that with the suppressed evidence there is "a 'reasonable probability' of a different result." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *see also Broom v. Mitchell*, 441 F.3d 392, 400 n.8 (6th Cir. 2006) (concluding that because petitioner could not satisfy ORC § 2953.23(A)(1), it was "no longer an available state court remedy"), *rehearing and rehearing en banc denied* (Aug. 9, 2006).

The warden's argument that D'Ambrosio can assert a *Brady* claim via a motion for a new trial pursuant to Ohio Rule of Criminal Procedure 33(B) is a closer question. There is Ohio Supreme Court authority that holds that in cases involving newly-discovered evidence, a motion for a new trial cannot be granted unless the movant shows, among other things, that the new evidence "discloses a strong probability that it will change the result if a new trial is granted." *State v. Petro*, 76 N.E.2d 370, 371 (Syllabus) (Ohio 1947). *Brady* requires only that there is a "reasonable probability" that the result would have been different. *See Kyles*, 514 U.S. at 434. In addition, the warden's conduct during the course of the federal habeas proceedings indicates that she did not view Rule 33 as an available state remedy. Until this appeal, the warden never argued that Rule 33 was a potential remedy that D'Ambrosio could have pursued. This is in contrast to the post-conviction petition remedy, which the warden discussed as a potential remedy in her Amended Return of Writ, with respect to procedural default. *See also Broom*, 441 F.3d at 399-401 (concluding that a prisoner sentenced to death in Ohio could raise an unexhausted *Brady* claim in a federal habeas petition because the petitioner could not bring a post-conviction petition in state court). On the other hand, this reading of the Rule 33 standard is questionable in light of *State v. Johnston*, 529 N.E.2d 898, 908-12 (Ohio 1988), which held that the Ohio courts of appeal should review a *Brady* claim in a Rule 33 motion under the federal *Brady* standard, not the more stringent *Petro* standard.

Finally, with respect to D'Ambrosio's third argument (asserting the "interest of comity, federalism, and justice"), he relies on the reasoning of *Granberry v. Greer*, 481 U.S. 129 (1987) and other pre-AEDPA cases, which we question in light of AEDPA. *See* 28 U.S.C. § 2254(b)(3).

[6]Likewise, for the reasons given by the district court, we reject D'Ambrosio's arguments in his cross-appeal. First, this court has refused to recognize a theoretical "free-standing" actual innocence claim, and even if such a claim existed, D'Ambrosio has not met his burden. *See, e.g., Davis v. Burt*, 100 F. App'x 340, 349-50 (6th Cir. 2004); *see also D'Ambrosio*, 2006 WL 1169926, at *34-39. Second, the Ohio Supreme Court's conclusion that D'Ambrosio knowingly waived his right to a jury trial is not an unreasonable application of federal law because D'Ambrosio signed a written waiver and engaged in a colloquy (albeit short) with the trial court. *See D'Ambrosio*, 2006 WL 1169926, at *40-41. Third, the Ohio Supreme Court's conclusion that counsel for D'Ambrosio was not constitutionally ineffective for failing to ask for the recusal of one of the trial judges was not an unreasonable application of federal law because the Ohio Supreme Court reasonably concluded that D'Ambrosio suffered no prejudice by the fact that the judge in question presided over Keenan's trial and approved Espinoza's plea agreement. *See id.* at *45-46. Finally, D'Ambrosio's spoliation of evidence claim fails because he cannot demonstrate that the exculpatory value of the lost evidence was apparent at the time that the evidence was lost. *See id.* at 48-49.

The evidence that the district court concluded was *Brady* material falls mostly within two broad categories. First, there is evidence that would have contradicted or weakened the testimony of the prosecution's only eyewitness to the murder, Edward Espinoza. This included (a) the unrecorded conclusions of Detectives Hayes and Goldstein, who investigated the crime scene and concluded that Klann was not murdered there; (b) a police report describing a tape in which a third party (Crimi) implicated unnamed other individuals in the murder; (c) a police report that noted that Klann was not wearing shoes or undershorts when his body was discovered; and (d) a police report stating that Hudak saw Klann alive the night after events that the prosecution claimed happened the night that Klann was murdered. Second, there is evidence that demonstrates a motive on the part of another individual, Paul Lewis. The prosecution failed to disclose that Lewis was being investigated, and had earlier been indicted, for a rape to which Klann was a witness. Consistent with Lewis's motive to kill Klann was undisclosed evidence that (a) Lewis anonymously called the police and revealed non-public facts about the murder; (b) Lewis first led the police to suspect D'Ambrosio; (c) Lewis requested police assistance with respect to an unrelated DUI in exchange for testimony against D'Ambrosio; and (d) Lewis fabricated a burglary to implicate D'Ambrosio in the murder.

The district court was correct that the first category of evidence would have further challenged the prosecution's version of events, whereas the second category of evidence would have revealed Lewis as a legitimate suspect. Together, this evidence would have substantially increased a reasonable juror's doubt of D'Ambrosio's guilt. Because the evidence that the prosecution suppressed would have had the effect of both weakening the prosecution's case and strengthening the defense's position that someone else committed the murder, there is a reasonable probability that the outcome of D'Ambrosio's trial would have been different.

The warden's arguments on the merits are mostly cursory challenges to the district court's conclusions that certain pieces of evidence were not exculpatory or material. The district court's opinion sufficiently addresses these arguments. Two arguments, however, require additional discussion.

First, the warden argues that the opinions of Detectives Hayes and Goldstein are not *Brady* evidence. D'Ambrosio argues that the detectives' opinions are *Brady* evidence because Hayes and Goldstein could have testified about their opinions at trial, their opinions were exculpatory, and the prosecutor has a duty under *Kyles v. Whitley*, *supra*, to learn of evidence favorable to a defendant that is known to the police. D'Ambrosio's argument that opinions of police detectives are always *Brady* evidence proves too much. It cannot be the law that every stray thought of a police detective about a case must be imputed to the State, such that the prosecutor has a duty to disclose that information, simply because a defendant could elicit the detective's opinion during trial. On the other hand, the warden's argument that the opinion of a police detective can never be *Brady* evidence if the detective never put that opinion in writing may also prove too much. For example, a police detective's opinion might be so concrete and well-known to other government agents working on a case that the prosecutor's failure to learn the opinion and disclose it to the defense could rise to the level of a *Brady* violation. We need not decide which position prevails in the instant case because even ignoring the detectives' opinions, the other suppressed evidence is material.

Second, the warden argues that the district court "abused its discretion" when it granted relief on a "false claim" by D'Ambrosio that the indictment against Lewis was dismissed after Klann's murder. The district court did not err. In 1988, a few months before Klann's murder, a grand jury returned an indictment charging Lewis with the rape of Christopher Longenecker. In August of 1988, that indictment was dismissed without prejudice. However, a second indictment was presented to the grand jury, and the grand jury no-billed the indictment in October of 1988, after Klann was murdered. There is nothing in the district court's opinion that indicates that the court

misunderstood this series of events. Even though the first indictment was dismissed before Klann was murdered, Lewis's motive to kill Klann remained because the indictment was dismissed without prejudice and could have been refiled later.

## IV.

For the foregoing reasons, the district court's order granting D'Ambrosio's petition for a writ of habeas corpus is AFFIRMED.

---

**DISSENTING IN PART**

---

BOGGS, Chief Judge, dissenting in part. I am in general agreement with most of what is written in the well-reasoned opinion for the court in this case. Unfortunately, I cannot agree that the actions of the state here met the requirement of AEDPA that a state does not waive the requirement of exhaustion "unless the State, through counsel, expressly waives the requirement." 28 U.S.C. § 2254(b)(3).

From the point of view of judicial economy and efficiency, to say of nothing of good practice, returning to state court at this point is probably not the best course. On the other hand, the balance of state and federal interests in the processing of habeas petitions from state court convictions is one for Congress to set, and Congress has done so through AEDPA. Thus, we must determine, based strictly on the language of AEDPA, whether the state's actions here constitute an "express" waiver. I simply cannot find that the state's silence, even in the face of the district court's stating that it was "without concern that Respondent will subsequently move to dismiss the Petition for failure to exhaust the amended claim" can be an express action. It may be "tacit," it may be "implicit," it may even be somewhat deceitful, but the warden's silence, in my opinion, cannot be "express." The court's opinion is quite correct that no "magic words" are needed, but it seems to me that *some* words, sign, signal, or indication other than silence is necessary for a waiver to be "express."

I would also note that the potential for gamesmanship exists on both sides here. It is true that the warden can be seen, knowingly or unwittingly, to have "hidden in the weeds" by neither raising nor waiving exhaustion, and then raising it on appeal. On the other hand, counsel for the petitioner, undoubtedly aware of the AEDPA requirement, also refrained from bringing the matter to a head. Petitioner could have demanded that the waiver be made "express" and thus nail the matter down in the district court. Of course, this would have run the risk that the warden might then have declined to waive and the court would then have been required to rule explicitly on the point, with the possible result that the federal proceedings would have been derailed awaiting such actual exhaustion. Thus, the weeds involved in this case may well have contained counsel for both Petitioner and Respondent.

In any event, I do not feel at liberty to deviate from what I consider the correct interpretation of the term "expressly waives," and I therefore respectfully dissent on this point.