# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
May 4, 2017

Plaintiff-Appellee,

v

No. 329770
Kalamazoo Circuit Court
LC No. 2002-000166-FC

JEFFREY EDWARD TITUS,

Defendant-Appellant.

Before: MURPHY, P.J., and METER and RONAYNE KRAUSE, JJ.

PER CURIAM.

In 2002, a jury convicted defendant of two counts of first-degree premeditated murder, MCL 750.316(1), and two counts of possessing a firearm during the commission of a felony (felon-firearm), MCL 750.227b, in connection with the November 17, 1990, murder of Doug Estes and James Bennett in the Fulton State Game Area in Kalamazoo County. The trial court sentenced defendant to life imprisonment for each murder conviction and two years' imprisonment for each felony-firearm conviction. This Court affirmed the convictions. *People v Titus*, unpublished opinion per curiam of the Court of Appeals, issued February 19, 2004 (Docket No. 243642). In 2014, defendant filed a motion for relief from judgment in the trial court. Defendant appeals by leave granted the April 24, 2015, order that denied his motion for relief. *People v Titus*, unpublished order of the Court of Appeals, entered March 24, 2016 (Docket No. 329770). We affirm.

The prosecution built its case using evidence that defendant was highly territorial regarding people hunting on his property,[1] which was adjacent to the state game area; evidence that defendant had taken Estes's shotgun from the area of the murders on the day of the murders

---

[1] As just one example, the prosecution presented a witness who testified that defendant, while waving a shotgun, had screamed at the witness to leave his (defendant's) property, even though the witness had been hunting on state-owned land.

-1-

and then claimed to have found it, later, in that area;[2] and evidence that defendant had made various inculpatory statements to witnesses.[3]

Defendant first argues that the trial court should have granted his motion because his trial attorney rendered ineffective assistance. Defendant argues that counsel should have interviewed and called two of the original detectives on the case, Roy Ballett and Bruce Wiersema.

A defendant has the burden of establishing entitlement to relief from judgment, MCR 6.508(D), and this Court reviews for an abuse of discretion a trial court's decision on a motion for relief from judgment, *People v Swain*, 288 Mich App 609, 628; 794 NW2d 92 (2010). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes . . . ." *Id*. Whether a defendant has been denied effective assistance of counsel is a mixed question of fact and constitutional law. *People v Stokes*, 312 Mich App 181, 189; 877 NW2d 752 (2015), lv pending. A trial court must first find the facts and then decide whether the facts establish a violation of the defendant's right to effective assistance of counsel. *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011). This Court reviews a trial court's factual findings for clear error, and it reviews de novo questions of constitutional law. *Id*. Clear error exists if this Court is left with a definite and firm conviction that the trial court made a mistake. *Id*.

To establish a claim of ineffective assistance of counsel, a defendant must show that counsel's performance fell below objective standards of reasonableness and that, but for counsel's deficient performance, there is a reasonable probability that the result of the proceedings would have been different. *People v Uphaus (On Remand)*, 278 Mich App 174, 185; 748 NW2d 899 (2008). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001) (citation and quotation marks omitted).

"Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v Seals*, 285 Mich App 1, 17; 776 NW2d 314 (2009) (citation and quotation marks omitted). A court may not substitute its judgment for that of counsel on matters of trial strategy, nor use the benefit of hindsight when assessing counsel's competence. *Id*. at 190. See also *Strickland v Washington*, 466 US 668, 689; 104 S Ct 2052; 80 L Ed 2d 674 (1984)

---

[2] Defendant claimed to have found the shotgun in a particular location after the police had left the area; he claimed that he cleaned it and then turned it over to the police. However, police testimony indicated that the gun was not in the area during the investigative search that occurred immediately following the murders.

[3] For example, defendant answered "probably" when a coworker asked him if he committed the murders. Another witness testified that defendant told him that he (defendant) could obtain a gun by confiscating one from a person on his property and grinding down the serial number. The same witness testified that defendant said he would have no problem "blowing away" people on his property and that "[h]e'd just tell the cops they drew first . . . ."

(stating that "[j]udicial scrutiny of counsel's performance must be highly deferential" and that a court must evaluate counsel's performance from counsel's perspective at the time).

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. [*Id*. at 690-691.]

A court may not grant a motion for relief from judgment if the motion alleges grounds for relief that could have been raised on direct appeal from the defendant's conviction, unless the defendant demonstrates (1) "good cause" for the failure to raise the grounds for relief on appeal and (2) "actual prejudice" from the alleged irregularities. MCR 6.508(D)(3)(a), (b). Actual prejudice, when the conviction was entered after a trial, means that, "but for the error, the defendant would have had a reasonably likely chance of acquittal[.]" MCR 6.508(D)(3)(b)(i).[4] A defendant may establish good cause for failing to raise the grounds for relief on appeal by showing that appellate counsel was ineffective for not raising the grounds. *People v Gardner*, 482 Mich 41, 49 n 11; 753 NW2d 78 (2008).

Defendant argues that he has satisfied the good-cause requirement because appellate counsel was ineffective for failing to raise the issue of defense counsel's ineffective assistance of counsel on direct appeal. The test for ineffective assistance of appellate counsel is the same as that applicable to a claim of ineffective assistance of trial counsel. *Uphaus (On Remand)*, 278 Mich App at 186. Thus, a defendant must show that appellate counsel's decision not to raise an issue on appeal fell below an objective standard of reasonableness and prejudiced the appeal. *Id*. Appellate counsel may winnow out weaker arguments in order to focus on those arguments that are more likely to prevail. *Id*. at 186-187.

We initially note that, throughout his brief, defendant claims that Detective Wiersema and Detective Ballett "cleared" him of any involvement in the murders. According to defendant,

---

[4] A court may waive the good-cause requirement if it concludes that there is a significant possibility that the defendant is innocent of the crime. MCR 6.508(D)(3). Defendant does not ask this Court to waive the good-cause requirement. Additionally, actual prejudice may exist with regard to a conviction entered after trial if "the irregularity was so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand regardless of its effect on the outcome of the case[.]" MCR 6.508(D)(3)(b)(iii). Defendant does not claim actual prejudice under this standard. In any event, even if defendant had raised arguments pertaining to actual innocence or "offensive irregularity," we would find no basis for reversal.

because the two detectives had cleared him, it was incumbent on defense counsel to interview the detectives. We cannot agree. Although both Detective Wiersema and Detective Ballett testified at the evidentiary hearing that they did not believe that defendant committed the murders, defendant points to no evidence indicating that defense counsel, *at the time of trial*, should have known that the two detectives believed that defendant was not involved in the murders. See *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009) (stating that counsel's competence may not be assessed with the benefit of hindsight), and *Strickland*, 466 US at 689 (stating that counsel's performance must be evaluated from counsel's perspective at the time). Additionally, defense counsel had the police reports, and therefore, defense counsel knew the details of the investigation. Defense counsel knew what evidence regarding defendant's guilt or innocence had been discovered by the police. Counsel must make an independent examination of the facts and circumstances of the charged crime, and "[t]his includes pursing all leads relevant to the merits of the case." *People v Grant*, 470 Mich 477, 487; 684 NW2d 686 (2004) (citation and quotation marks omitted). Although defense counsel did not interview Detective Wiersema and Detective Ballett, there is no indication that defense counsel failed to pursue a valid lead.

Defendant's primary claim with regard to the detectives is that they should have been interviewed regarding defendant's alibi. On November 28, 1990, 11 days after the murders, Detective Wiersema and Detective Ballett interviewed Eloise and Gerald Shepard, who owned a farm on which defendant hunted. The Shepards signed a written statement, which provided that on November 17, 1990 (the day of the murders), they had coffee with defendant and Stan Driskell, who had come to the Shepard farm to hunt, that defendant and Driskell were there all afternoon, and that they knew defendant was there until dark because they saw him drive out of the driveway with a deer. Detective Ballett also made a report of the interview, and the report mirrored the written statement. Significantly, defendant has made no claim that the written statement and Detective Ballett's report were not provided to defense counsel.

The Shepards' written statement (and Detective Ballett's report) supported defendant's claim of alibi. It suggested that in the late afternoon of November 17, 1990, defendant was at the Shepard farm, which was more than 25 miles from the state game area. However, the written statement provided limited facts. It did not specifically state what time the Shepards had coffee with defendant and Driskell, nor did it provide any facts to support the Shepards' claim that defendant and Driskell were there all afternoon. In addition to the Shepards' written statement, defense counsel had other evidence to support defendant's claim of alibi: the testimony of Driskell. Driskell testified that he hunted with defendant on November 17, 1990, at either the Shepard farm or Crandall farm and that, based on their habit and routine, he and defendant would have gone into separate blinds at 4:00 p.m. Driskell recalled meeting up with defendant around 5:45 or 6:00 p.m. and that defendant, whose demeanor was normal, had a deer. Although Driskell acknowledged that he and defendant could not see each other while they were in their blinds, the remainder of Driskell's testimony, along with evidence that the Shepard and Crandall farms were a 35- or 40-minute drive from defendant's property, provided evidence from which defense counsel could argue that defendant could not have murdered Estes and Bennett. Applying a heavy measure of deference to defense counsel's judgment, where defense counsel had testimony that only provided for a two-hour period where defendant could have left the Shepard farm, driven to his property and shot Estes and Bennett, and returned to the Shepard

farm with a freshly killed deer in his truck, defense counsel's decision not to interview Detective Wiersema and Detective Ballett regarding their interview of the Shepards was reasonable. *Strickland*, 466 US at 691. In making this conclusion, we note, with significance, that nothing in the Shepards' written statement or in Detective Ballett's report indicates that the Shepards told the two detectives anything concrete that could have provided a shorter timeframe than that given by Driskell for defendant to have left their farm. Defense counsel was not ineffective for failing to interview Detective Wiersema and Detective Ballett regarding their interview of the Shepards.

Defendant also argues that defense counsel was ineffective for failing to call Detective Wiersema and Detective Ballett to testify about the Shepards' statement. " 'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). The Shepards' statement is hearsay. It is an out-of-court statement that defendant has offered to prove the truth of the matter asserted, i.e., that he was at the Shepard farm until dark on November 17, 1990. Hearsay is not admissible unless it falls within an exception to the hearsay rule. MRE 802; *People v McDade*, 301 Mich App 343, 353; 836 NW2d 266 (2013). MRE 804 provides exceptions to the hearsay rule for when the declarant is unavailable as a witness. *People v Duncan*, 494 Mich 713, 724; 835 NW2d 399 (2013). A declarant is unavailable when the declarant has a lack of memory of the subject matter of the declarant's statement. MRE 804(a)(3). The prosecution and defendant stipulated that the Shepards, because of memory problems, were unavailable as witnesses at the time of trial.

Under MRE 804(b)(7), if the declarant is unavailable, the following out-of-court statements of the declarant are not excluded by the hearsay rule:

> A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact, (B) the statement is more probative for which it is offered than any other evidence that the proponent can procure through reasonable efforts, and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

The most important requirement of MRE 804(b)(7) is that the proffered statement have circumstantial guarantees of trustworthiness equivalent to those of categorical hearsay exceptions. *People v Steanhouse*, 313 Mich App 1, 25-26; 880 NW2d 297 (2015), lv gtd 499 Mich 934 (2016). A trial court should consider the totality of the circumstances surrounding the statement to determine whether equivalent guarantees of trustworthiness exist. *Id*. There is no complete list of factors that establish whether a statement has equivalent guarantees of trustworthiness. *Id*. However, relevant factors include:

> (1) the spontaneity of the statements, (2) the consistency of the statements, (3) lack of motive to fabricate or lack of bias, (4) the reason the declarant cannot testify, (5) the voluntariness of the statements, i.e., whether they were made in response to leading questions or made under undue influence, (6) personal knowledge of the declarant about the matter on which he [or she] spoke, (7) to

whom the statements were made . . . , and (8) the time frame within which the statements were made. [*People v Geno*, 261 Mich App 624, 634; 683 NW2d 687 (2004) (citations and quotation marks omitted).]

In concluding that the Shepards' statement was not admissible under MRE 804(b)(7), the trial court did not determine whether the statement had sufficient guarantees of trustworthiness. Rather, it concluded that the statement failed to meet the requirement in MRE 804(b)(7) that "the statement is more probative on the point for which it is offered than any other evidence that the proponent can procure through reasonable efforts." Regarding this requirement, the Supreme Court has stated:

> The third requirement is that the proffered statement be the most probative evidence reasonably available to prove its point. It "essentially creates a 'best evidence' requirement." This is a high bar and will effectively limit use of the residual exception to exceptional circumstances. For instance, nonhearsay evidence on a material fact will nearly always have more probative value than hearsay statements, because nonhearsay derives from firsthand knowledge. Thus, the residual exception normally will not be available if there is nonhearsay evidence on point. [*People v Katt*, 468 Mich 272, 293; 662 NW2d 12 (2003) (citation omitted).[5]]

The trial court concluded that the Shepards' statement[6] was of no probative value for the proposition for which defendant wanted to use it—that he was at the Shepard farm all afternoon. Evidence has probative value when it makes a fact of consequence more or less probable than it would be without the evidence. *People v Mills*, 450 Mich 61, 67; 537 NW2d 909 (1995), mod on other grounds 450 Mich 1212 (1995). The Shepards' statement did have probative value: because the statement indicated that defendant and Driskell were hunting all afternoon on November 17, 1990, at the Shepard farm and that the Shepards knew defendant was there until

---

[5] When it made this statement, the Supreme Court in *Katt* was addressing MRE 803(24). However, like MRE 804(b)(7), MRE 803(24) is a "residual exception," *Katt*, 468 Mich at 279, and it is nearly identical to MRE 804(b)(7), *Steanhouse*, 313 Mich App at 25. This Court has used *Katt* to explain the contours of MRE 804(b)(7). *Id*. at 25-26.

[6] In reaching its conclusion, the trial court only looked at Detective Ballett's report of the interview with the Shepards, which, as stated, mirrored the Shepards' written statement. Defendant believes, however, that the trial court should have considered everything that the Shepards said to the two detectives, not just what was included in the written statement. We do not agree. The trial court properly limited its review to the Shepards' written statement and Detective Ballett's report. As already concluded, defense counsel was not ineffective for failing to interview Detective Wiersema and Detective Ballett regarding the detectives' interview of the Shepards. Thus, at the time of trial, defense counsel could have only moved to admit the Shepards' statement as reflected in the Shepards' written statement and Detective Ballett's report.

dark because they saw defendant drive out of the driveway with a deer, the statement made it more probable that defendant was at the Shepard farm at the time of the murders. However, the fact that the Shepards' statement had probative value was not sufficient to meet the requirements of MRE 804(b)(7); the statement must also have been more probative on the point for which it was offered than any other evidence. Evidence is generally not admissible under MRE 804(b)(7) if there is nonhearsay evidence on point. *Katt*, 468 Mich at 293. On the point regarding whether defendant was at the Shepard farm at the time of the murders, there was nonhearsay evidence— the testimony of Driskell. The testimony of Driskell was more probative on the point than the Shepards' statement. Driskell's testimony included specific times when Driskell saw defendant and those times only provided, at most, for a two-hour timeframe when defendant could have left the Shepard farm, drove to his property and killed Estes and Bennett, and drove back to the Shepard farm with a freshly killed deer, whereas the Shepards' statement provided no specific times for when the Shepards saw defendant and instead gave a general, unsupported statement that he was there all afternoon.[7] The trial court did not abuse its discretion in concluding that the Shepards' written statement was not admissible under MRE 804(b)(7). See *People v Unger*, 278 Mich App 210, 216; 749 NW2d 272 (2008) (stating that a trial court's evidentiary decisions are reviewed for an abuse of discretion).

Counsel is not ineffective for failing to make a futile motion. *People v Fike*, 228 Mich App 178, 182; 577 NW2d 903 (1998). Because the Shepards' statement was not admissible under MRE 804(b)(7), we conclude that defense counsel was not ineffective for failing to move to admit the statement into evidence.

Defendant next argues that defense counsel was ineffective for failing to interview Detective Wiersema and Detective Ballett about the interview of Bonnie Huffman and for not impeaching Huffman with her statement in 1990 that defendant visited Patricia Burnworth's house around 8:00 or 9:00 p.m. Defendant argues that Huffman's testimony at trial that defendant stopped at Burnworth's house before dark and stayed for 20 to 30 minutes supported the prosecution's theory regarding the murders (because it placed defendant in the area of the murders around the time of the murders), and the jury, improperly, never heard that Huffman stated during an interview that defendant did not visit Burnworth's house until 8:00 or 9:00 p.m.

Following the evidentiary hearing, during which Detective Wiersema testified that that he interviewed Huffman and Huffman told him that she quit hunting between 5:30 and 6:30 p.m. and that, after she had been visiting with Burnworth for some time, defendant stopped at Burnworth's house between 8:00 and 9:00 p.m., defendant argued that defense counsel was ineffective for failing to interview Detective Wiersema about his interview with Huffman and for failing to impeach Huffman with her statement to the detective. In a December 3, 1990, supplemental report, Detective Wiersema wrote that he spoke with Huffman and Huffman told him that while she was hunting on the southwest corner of Burnworth's property, she heard a car go into the ditch, she heard people stop and offer to help, and the driver of the car refused the

---

[7] That the Shepards saw defendant leave at dark with a deer did not foreclose the possibility that he had departed earlier and returned.

offers.[8]  Nothing in Detective Wiersema's written report indicated that Huffman told the detective that Huffman saw defendant at Burnworth's house on November 17, 1990.

Defense counsel was not ineffective for failing to interview Detective Wiersema and Detective Ballett about Huffman's 1990 interview.  Without using the benefit of hindsight to assess defense counsel's performance, *Payne*, 285 Mich App at 190, where defense counsel had the police reports, which contained a summary of Huffman's statements, defense counsel's decision not to interview Detective Wiersema and Detective Ballett about Huffman's interview was reasonable, *Strickland*, 466 US at 691.[9]

As stated, defendant also argues that defense counsel was ineffective for not impeaching Huffman with her statement in 1990 that defendant visited Burnworth's house around 8:00 or 9:00 p.m.  However, the only evidence that Huffman made this statement was the testimony of Detective Wiersema and Detective Ballett at the evidentiary hearing, which was given 13 years after trial.  The statement was not contained in the December 3, 1990, supplemental report.  Because defense counsel was not ineffective for failing to interview the two detectives about Huffman's interview, defense counsel cannot be faulted for not knowing about Huffman's statement regarding what time defendant was at Burnworth's house.  Because defense counsel did not know about Huffman's 1990 statement, defense counsel could not have used it to impeach Huffman's testimony that defendant arrived at Burnworth's house soon after she quit hunting around 5:15 p.m.[10]

Defendant next argues that defense counsel was ineffective for failing to interview Detective Wiersema about the grid search that took place in the area surrounding the murder scene.  He also argues that defense counsel was ineffective for failing to impeach Deputy Russell Richards's testimony with Deputy Thomas Sharp's supplemental report regarding the search.

Neither party suggests that any police report other than Deputy Sharp's supplement report documented the grid search.  Deputy Sharp's supplemental report provided, in pertinent part:

> After the completion of measurements and collection of evidence . . . , [Deputy Sharp] was instructed to maintain with the scene throughout the night until the morning hours so that a more extensive search of the scene could be conducted in the daylight to ascertain if there was any other evidence in the immediate area.

---

[8] This information went to defendant's theory that that the murders were drug-related and that the supposed murderer drove into the ditch.

[9] Defendant had informed the trial court that the first time that Huffman gave a time when defendant was at Burnworth's house on November 17, 1990, was when Huffman was interviewed by Detective Gwen Romanek in 2002.

[10] In addition, we note that the jury heard testimony from Burnworth that she believed defendant came to her home between 8:00 and 9:00 p.m.

At approximately 0630 hours, Deputy RUSS RICHARDS arrived at [Deputy Sharp's] location to assist in a search of the scene and at approximately 7:15AM, after daylight was sufficient, a search was made of the immediate area around the scene of the shooting in an attempt to locate any physical evidence and to locate a second weapon. Information had been received that victim #2, ESTES, had had a shotgun with him, however, the shotgun was not present at the scene when officers arrived.

Deputy RICHARDS and [Deputy Sharp] searched the area approximately 50' to 60' in a circumference around the scene. It should be noted that the area is heavily wooded and after dawn had broke and a better view of the area was obtained, it was observed that to the immediate south is a very heavy swamp area with numerous sink holes. This area could not be covered due to the water and the marsh area.

Also, it should be noted that upon searching beyond the 50' to 60' radius of the scene, officers located numerous spent shotgun shell casings of various gauges . . . .

Officers had negative results in locating any physical evidence in the immediate area of the scene.

Deputy Sharp's supplemental report provided no indication that Detective Wiersema was present for or involved in the search for the shotgun on November 18, 1990. Because Detective Wiersema was not present when the grid search was conducted, meaning that he had no personal knowledge of the search, reasonable professional judgment supported defense counsel's decision not to interview Detective Wiersema about the grid search. *Id*. at 690-691.

Nor was defense counsel ineffective for failing to use Deputy Sharp's supplemental report to impeach Deputy Richards. Deputy Richards testified that he was shown photographs of the area where defendant reported to have found the shotgun. According to Deputy Richards, he and Deputy Sharp had searched the area, their search was "very, very thorough," and he could "positively say without a doubt" that the shotgun had not been there on November 18, 1990. Decisions regarding how to cross-examine a witness involve matters of trial strategy. *In re Ayres*, 239 Mich App 8, 23; 608 NW2d 132 (1999). Defense counsel *could* have used Deputy Sharp's supplemental report to impeach Deputy Richards. Although no specific testimony was given at trial regarding the distance between where the bodies were found and the location where defendant reported to have found the gun, a report written by Detective Wiersema indicated that the distance was 125 feet. Deputy Sharp's supplemental report, which indicated that Deputy Richards and Deputy Sharp searched within a 50- to 60-foot radius from the bodies, when combined with evidence regarding the distance between the locations of the bodies and the shotgun, could have impeached Deputy Richards's testimony.

However, there was some ambiguity in Deputy Sharp's supplemental report regarding the exact area searched. It indicated that there had been some searching *beyond* the 50- to 60-foot radius. Where there was some ambiguity regarding the area searched, defense counsel may have believed it best not to attempt to impeach Deputy Richards. Deputy Richards, on direct

examination, unequivocally testified that the grid search included the location where defendant reported that he had found the shotgun. Defense counsel may have decided it was best to avoid the possibility of Deputy Richards stating that Deputy Sharp's supplemental report was inaccurate and reiterating on cross-examination, as well as possibly on redirect, that he had no doubt that the shotgun had not been there on November 18, 1990. Accordingly, defendant has failed to overcome the presumption that defense counsel, in cross-examining Deputy Richards, provided effective assistance of counsel. *Seals*, 285 Mich App at 17.[11]

Because defendant has failed to establish that defense counsel's performance was deficient, appellate counsel was not ineffective for failing to raise the claims of ineffective assistance on direct appeal. Defendant has failed to establish good cause, MCR 6.508(D)(3)(a), and defendant is not entitled to relief on his claims of ineffective assistance of counsel.

Defendant next argues that the prosecution violated *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963), by failing to disclose that Detective Richard Mattison had theorized that two shooters perpetrated the murders.

In *Brady*, 373 US at 87, the United States Supreme Court held that a defendant's due process rights are violated when the prosecution, irrespective of its good faith or bad faith, suppresses evidence that is material either to guilt or punishment. There are three components to a successful *Brady* claim: (1) the evidence was favorable to the defendant, (2) the prosecution suppressed the evidence, and (3) the evidence was material and its suppression prejudicial. See *Strickler v Greene*, 527 US 263, 281-282; 119 S Ct 1936; 144 L Ed 2d 286 (1999), and *People v Chenault*, 495 Mich 142, 149-150, 155; 845 NW2d 731 (2014). The Michigan Supreme Court in *Chenault* interpreted pertinent case law as requiring a defendant to show, for the third prong, that he did not receive "a trial that resulted in a verdict worthy of confidence . . . ." *Id*. at 156. The evidence required to be disclosed under *Brady* encompasses not only evidence that is admissible in present form, but also evidence that could potentially lead to admissible evidence favorable to the defense. *United States v Rodriguez*, 496 F3d 221, 226 n 4 (CA 2, 2007).[12] The prosecution is not required to make "a complete and detailed accounting to the defense of all police investigatory work on a case." *United States v Agurs*, 427 US 97, 109; 96 S Ct 2392; 49 L Ed 2d 342 (1976) (citation and quotation marks omitted). The prosecution has no obligation to

---

[11] We note that even if defense counsel had attempted to impeach Deputy Richards with Deputy Sharp's supplemental report, the prosecution could have provided rebuttal evidence from Sergeant Marty Johnson that the area searched specifically included the area where defendant purported to have found the shotgun. Defendant argues that this Court should not consider Sergeant Johnson's affidavit because it was not part of "the trial, appellate, or post-conviction record." However, defendant fails to acknowledge that the affidavit was attached to the prosecution's brief in opposition to defendant's motion for relief from judgment, that the prosecution requested the trial court to consider it, that defendant posed no objection to it, and that the trial court did consider it.

[12] Decisions from the lower federal courts are not binding on this Court, although the Court may find them persuasive. *People v Fomby*, 300 Mich App 46, 50 n 1; 831 NW2d 887 (2013).

-10-

communicate preliminary, challenged, or speculative information. *Id*. at 109 n 16. To establish a *Brady* claim, a defendant need not show that he was unable to obtain the evidence with reasonable diligence. *Chenault*, 495 Mich at 155. However, if the defendant knew of the evidence, the likelihood that the defendant can establish a *Brady* violation is reduced. *Id*.

Evidence is favorable to the defense if it is exculpatory or impeaching. *United States v Bagley*, 473 US 667, 676; 105 S Ct 3375; 87 L Ed 2d 481 (1985); *Chenault*, 495 Mich at 150. The trial court concluded that Detective Mattison's two-shooter theory was favorable to defendant. It was the prosecution's theory that one person—defendant—shot Estes and Bennett. Evidence that two shooters were involved in the murders at the state game area tended to establish defendant's innocence. We agree with the trial court that Detective Mattison's two-shooter theory was favorable to defendant.

Regarding the second component of a *Brady* claim, the trial court stated that Detective Mattison's two-shooter theory was not shared with defendant. The trial court then questioned whether Detective Mattison's two-shooter theory was "*Brady* material," ultimately concluding that the theory had little materiality and that any "prejudice suffered as a result of . . . nondisclosure was [not] sufficient to call the verdict into question."

We find no *Brady* violation.

We initially note that Detective Mattison never memorialized his two-shooter theory. This fact, however, is not determinative. A prosecution's obligation to disclose evidence under *Brady* exists without regard to whether the evidence has been recorded in tangible form. *Rodriguez*, 496 F3d at 226. Additionally, the prosecution has a duty to learn of and disclose any favorable evidence that is known to others acting on the prosecution's behalf, including the police. *Kyles v Whitley*, 514 US 419, 437; 115 S Ct 1555; 131 L Ed 2d 490 (1995).

In *D'Ambrosio v Bagley*, 527 F3d 489, 492, 498-499 (CA 6, 2008), the murder victim was found in a creek, and the plaintiff argued that the opinion of the initial investigating detectives that the victim was murdered elsewhere and then dumped into the creek was not *Brady* material. The Sixth Circuit did not decide whether the detectives' opinions were *Brady* evidence, but it gave some guidance regarding whether the opinions of police must be disclosed to a defendant:

> [The defendant's] argument that opinions of police detectives are always *Brady* evidence proves too much. It cannot be the law that every stray thought of a police detective about a case must be imputed to the State, such that the prosecutor has a duty to disclose that information, simply because a defendant could elicit the detective's opinion during trial. On the other hand, the warden's argument that the opinion of a police detective can never be *Brady* evidence if the detective never put that opinion in writing may also prove too much. For example, a police detective's opinion might be so concrete and well-known to other government agents working on a case that the prosecutor's failure to learn the opinion and disclose it to the defense could rise to the level of a *Brady* violation. We need not decide which position prevails in the instant case because

-11-

even ignoring the detectives' opinions, the other suppressed evidence is material. [*Id*. at 499.]

We conclude that Detective Mattison's two-shooter theory was not required to be disclosed. The prosecution was not required to give the defense a complete and detailed accounting of all the investigatory work done by the cold-case team. *Agurs*, 427 US at 109. It did not have to provide the defense with preliminary, challenged, or speculative information. *Id.* at 109 n 16. Detective Mattison reached his two-shooter theory after reviewing the crime-scene photographs, the autopsy reports, and the statements of witnesses. Detective Mattison testified that, while he believed his training and experience in crime-scene reconstruction helped him reach his theory, he had no specialized training that the other members of the cold-case team did not have. Specifically, he testified that his training in ballistics and crime-scene reconstruction was fairly average among the members of the cold-case team. Detective Mattison shared his two-shooter theory with the cold-case team, but the team did not pursue the theory. According to Sergeant Mike Werkema, it was the consensus of the cold-case team that, based on "the three seconds and the closeness and the swiveling," there was only one shooter. Under these circumstances, in which Detective Mattison shared his two-shooter theory with the cold-case team and it was rejected by the team, whose members did not lack any training that Detective Mattison possessed, we conclude that the two-shooter theory was preliminary, challenged, or speculative information. Because the prosecution was not required to provide the defense with preliminary, challenged, or speculative information, there was no *Brady* violation. The trial court did not abuse its discretion in denying defendant's motion for relief from judgment based on the claim of a *Brady* violation.

Defendant lastly presents the following issue for appeal: "Did the trial court abuse its discretion in concluding that the prosecution's character evidence and [defendant's] offhand remarks about the killing to his co-workers somehow outweighed the new evidence of innocence?" Defendant does not cite any law in support of this last appellate issue, but he appears to be making an argument regarding cumulative error. However, given that defendant has failed to establish that he was denied the effective assistance of counsel or that there was a *Brady* violation, there are no irregularities that can be combined to determine a cumulative effect of errors. See *People v Bahoda*, 448 Mich 261, 293 n 64; 531 NW2d 659 (1995) (stating that a court, in determining whether the cumulative effect of errors denied the defendant a fair trial, must only consider actual errors).

Affirmed.

/s/ William B. Murphy
/s/ Patrick M. Meter
/s/ Amy Ronayne Krause